Cite as 2023 Ark. App. 36

# ARKANSAS COURT OF APPEALS

DIVISION I

No. CV-22-431

| | |
|---|---|
| LAUREN TAYLOR<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | **Opinion Delivered** February 1, 2023<br><br>APPEAL FROM THE CONWAY COUNTY CIRCUIT COURT<br>[NO. 15JV-22-5]<br><br>HONORABLE TERRY SULLIVAN, JUDGE<br><br>AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Lauren Taylor appeals the Conway County Circuit Court's order adjudicating her child, MC ("minor child"), dependent-neglected. On appeal, Taylor argues that (1) the circuit court lacked subject-matter jurisdiction; and (2) there was insufficient evidence to support the finding that MC was dependent-neglected. Finding no error, we affirm.

On January 12, 2022, family service worker (FSW) Ashley Ryan received a call from Detective Nate Watkins with the Morrilton Police Department. Detective Watkins informed Ryan that they received a 911 call from an out-of-state mother after she experienced car trouble at a Morrilton gas station. He stated that Taylor told police that she could no longer handle her almost six-year-old son and did not want him anymore. Once FSW Ryan arrived at the gas station, she spoke with Detective Watkins and Officer Brenda Gilliam, who both expressed concerns for Taylor's mental health. Taylor told FSW Ryan that she was going through a hard time and had looked up

places in Michigan where she could drop off MC. She then stated that it was her plan to take MC back to Arizona with her. When asked if she was planning to stay in Arizona, Taylor stated that it was up to "someone" but refused to name the "someone."

Officer Alvey Bryant with the Morrilton Police Department stated to FSW Ryan that he had been in contact with the Tucson Police Department in Arizona and was informed that Taylor had been transported to a mental hospital in 2020.

FSW Ryan also spoke with MC. She questioned MC regarding a bandaged cut on his nose, to which he alleged that Taylor had punched him. Taylor became defensive and told MC "don't be lying." When FSW Ryan took MC to the side to speak to him privately, Taylor became upset and began to yell and come toward them. Taylor told MC that "these white people want to keep you in Arkansas, but you are going to your grandma's house." Morrilton police had to restrain Taylor and escort her outside. MC then stated to FSW Ryan, FSW Tammy Foster, and Detective Watkins that Taylor "drains" him "in the bathtub." He indicated that Taylor pushes his face underwater, and water goes into his nose and it burns and goes into his mouth. MC stated that Taylor "drains" him "to get the badness out."

MC was also interviewed by the Child Advocacy Center. During the interview, MC again stated that Taylor had punched him. He further disclosed that they had been in an accident. MC stated that a blue car was coming at them; their van began to spin when Taylor swerved to miss the oncoming car. He said that he was in the front seat of the van when the incident occurred and that a pizza box hit him in the head.

Due to concerns about Taylor's behavior, emotional stability, and the allegation that she injured MC, it was determined that a seventy-two-hour hold was necessary to protect MC. An

emergency order was entered on January 13, placing MC in the custody of the Arkansas Department of Human Services (the Department).

A probable-cause hearing was then scheduled to take place on January 20. At that hearing, the circuit court found that, following MC's disclosure of physical abuse, there was probable cause that he was dependent-neglected, and immediate action was necessary to protect his health, safety, and welfare and that it continued to be in MC's best interest to remain in the custody of the Department. Taylor stated at the probable-cause hearing that her home address is an apartment where her sister resides in Maryland, but she is currently staying in a hotel in Arkansas. The circuit court ordered Taylor to follow the case plan and cooperate with the Department; maintain weekly contact with the caseworker and keep the Department informed of her current address and phone numbers; obtain and maintain safe and stable housing with utilities turned on; allow the Department access into the home for monitoring; obtain and maintain stable employment or income sufficient to support the family; watch the video "The Clock is Ticking"; complete parenting classes; remain drug-free and submit to random drug screens with any refusal or failure to comply to be deemed a positive result; and submit to hair or nail-bed drug testing upon request of the Department. Additionally, if requested by the Department, Taylor was ordered to submit to a drug-and-alcohol assessment and follow the recommendations thereof; attend AA/NA meetings at least weekly and provide proof of attendance; and submit to a psychological assessment and participate in any recommended mental-health treatment or counseling.

An adjudication hearing was held on March 3. Following the hearing, in an order entered on April 20, the circuit court adjudicated MC dependent-neglected; specifically, the court found that MC was at substantial risk of serious harm due to Taylor's emotional stability and parental unfitness.

MC was ordered to remain in the custody of the Department because his health and safety could not be protected if returned to Taylor. The goal of the case was established as reunification.

Taylor appeals from the circuit court's adjudication order finding MC dependent-neglected.

On appeal, Taylor asserts that the circuit court lacked subject-matter jurisdiction because Arkansas was not MC's home state as defined by the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), codified at Arkansas Code Annotated sections 9-19-101 to -401.[1] The UCCJEA provides the exclusive method for determining the proper forum in child-custody proceedings involving other jurisdictions.[2] A child- custody proceeding under the UCCJEA includes proceedings for neglect, abuse, and termination of parental rights.[3] A court has jurisdiction to make an initial determination if the state is the home state of the child.[4] Home state is defined as "the state in which a child lived with a parent or a person acting as a parent for at least six (6) consecutive months immediately before the commencement of a child-custody proceeding . . . ."[5]

However, an Arkansas court "has temporary emergency jurisdiction of the child if present in the state and the child has been abandoned or it is necessary in an emergency to protect the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse."[6]

---

[1](Repl. 2020).

[2]*Ark. Dep't of Hum. Servs. v. Waugh*, 2015 Ark. App. 155, 457 S.W.3d 286.

[3]Ark. Code Ann. § 9-19-102(4).

[4]Ark. Code Ann. § 9-19-201(a).
[5]Ark. Code Ann. § 9-19-102(7).

[6]Ark. Code Ann. § 9-19-204(a).

Additionally, if there is no previous child-custody determination that is entitled to be enforced and no proceeding has been commenced in a state having jurisdiction, a child-custody determination made under this section remains in effect until an order is obtained from a court having jurisdiction.[7] If no other proceeding has or is commenced in a state having jurisdiction, this section becomes a final determination, if it so provides and this state becomes the home state of the child.[8] This state is required to communicate with another state about the emergency finding only if another proceeding is commenced in that other state.[9]

Our standard of review is de novo, although we will not reverse the circuit court's findings of fact unless they are clearly erroneous.[10] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[11] When a circuit court has discretion to decide whether to decline to exercise jurisdiction under the UCCJEA, we will not reverse the decision absent an abuse of discretion.[12]

Taylor "does not dispute a circuit court's ability to protect children in an emergency situation." Instead, she argues "this case went well beyond the need to maintain [MC] in Arkansas in

---

[7]Ark. Code Ann. § 9-19-204(b).

[8]Ark. Code Ann. § 9-19-204(d).

[9]*Id*.

[10]*Waugh*, s*upra*.
[11]*Mills v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 197, 644 S.W.3d 256.

[12]*Waugh*, *supra*.

5

order to protect him." She asserts that Arkansas should have immediately sought to transfer the case to MC's home state, which she claims to be Maryland. Taylor asserts that it was clear that neither she nor MC resided in Arkansas nor did they have any significant ties to the state. She argues that despite the lack of connection to Arkansas, there were no steps taken to transfer the case to MC's home state. Taylor argues that she was then faced with establishing a home, securing employment, and working toward reunification in a state in which she has no family support. She contends that the law provides a mechanism for the circuit court to transfer the case to the home state while simultaneously protecting MC; yet, to the detriment of MC, those steps were not followed.

In *Davis v. Arkansas Department of Health & Human Services*,[13] the appellant argued that the circuit court erred in exercising jurisdiction beyond the initial emergency proceeding because the children had moved to Arkansas from Louisiana only four months before they were taken into custody. This court held that the UCCJEA did not require a circuit court that had assumed temporary jurisdiction to return custody to a parent where there was no competing custody order. We held that because there was no credible evidence of a custody order or a current custody proceeding in Louisiana, the provisions of Arkansas Code Annotated section 9-19-204(b) applied, and Arkansas became the home state of the children. We concluded that the circuit court acted correctly when it continued to exercise subject-matter jurisdiction beyond the initial emergency proceeding, continuing through termination.

"If a child-custody proceeding has not been or is not commenced in a court of a state having jurisdiction under §§ 9-19-201 — 9-19-203, any order issued by a court of this state under this

---

[13]98 Ark. App. 275, 254 S.W.3d 762 (2007).

section becomes a final determination, if it so provides and this state becomes the home state of the child."[14] Here, as in *Davis*, there was no evidence that there was a prior custody order that was entitled to enforcement, nor was there an action commenced in another state having jurisdiction.[15] Therefore, Arkansas became MC's home state. Although Taylor argues that the circuit court erroneously exercised jurisdiction beyond the emergency, we conclude that the circuit court continued to have subject-matter jurisdiction at the adjudication hearing.

Additionally, we note Taylor's assertion that Maryland should have been considered MC's home state. Taylor argues that her address was in Maryland and that it should be considered MC's home state for purposes of child-custody proceedings. However, the record does not support her argument. Although Taylor testified that she had previously lived in Maryland and was planning to return, when this case arose, she and MC had lived in Arizona for over a year and were in the process of moving. Taylor indicated that she intended to move in with her sister in Maryland and had been traveling back and forth between Maryland and Arizona. However, her sister stated that she had not seen Taylor in more than a year. Under these facts, Taylor failed to establish Maryland as MC's home state, and she advances no argument that Arizona is his home state.

Taylor next challenges the sufficiency of the evidence supporting the circuit court's finding that MC was dependent-neglected.

Pursuant to Arkansas Supreme Court Rule 6-9(a), an order adjudicating a juvenile dependent-neglected is a final, appealable judgment. In reviewing dependency-neglect

---

[14]Ark. Code Ann. § 9-19-204(b).

[15]Taylor stated she had a pending civil action against a restaurant in Arizona; however, there was no indication that child custody was an issue in that case.

adjudications, this court will defer to the circuit court's evaluation of the credibility of the witnesses.[16] A circuit court's findings will not be reversed unless they are clearly erroneous or clearly against the preponderance of the evidence.[17] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made.[18]

An adjudication hearing is held to determine whether the allegations in a dependency-neglect petition are substantiated by the proof.[19] The Juvenile Code requires proof by a preponderance of the evidence in dependency-neglect proceedings.[20] A dependent-neglected juvenile is any juvenile "at substantial risk of serious harm as a result of the following acts or omissions to the juvenile . . . (i) abandonment; (ii) abuse; (iii) sexual abuse; (iv) sexual exploitation; (v) neglect; (vi) parental unfitness; or (vii) being present . . . during the manufacturing of methamphetamine with the knowledge of his or her parent, guardian, or custodian."[21] The statutory definition of a neglected child does not require proof of actual harm or impairment having been experienced by the child. The term substantial risk speaks in terms of future harm.[22]

---

[16]*Id.*

[17]*Id.*

[18]*Merritt v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 552, 473 S.W.3d 31.

[19]Ark. Code Ann. § 9-27-327(a)(1)(A) (Repl. 2020).
[20]Ark. Code Ann. § 9-27-325(h)(2)(A)(ii) (Supp. 2021).

[21]Ark. Code Ann. § 9-27-303(17)(A).

[22]*Maynard v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 82, 389 S.W.3d 627.

A parent's actions that constitute abuse or neglect are sufficient to demonstrate parental unfitness.[23] Parental unfitness "is not necessarily predicated upon the parent's causing some direct injury to the child in question. Such a construction of the law would fly in the face of the General Assembly's expressed purpose of protecting dependent-neglected children and making those children's health and safety the juvenile code's paramount concern."[24] The juvenile code's goal is to prevent abuse of children, if at all possible, before it occurs.[25]

In the case at bar, the circuit court found MC dependent-neglected due to parental unfitness. The court further stated that Taylor's "emotional stability seriously affects her current ability to supervise, protect, or care for the child."

At the adjudication hearing, multiple witnesses testified that Taylor indicated that she could not care for MC anymore. Officer Gilliam testified that, upon dispatch, when she arrived at the gas station, Taylor explained that she was having issues and asked if Gilliam could take MC because she could not take care of him; Taylor told Gilliam that she did not want to get angry and something bad happen to MC. Gilliam described Taylor as very emotional and under a lot of stress. Detective Watkins also testified that Taylor stated that MC was interfering with her life and she was done with him. He indicated that her demeanor was concerning and was consistent with reports from Arizona regarding her mental state.

---

[23]*Merritt v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 552, 473 S.W.3d 31.

[24]*Bean v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 350, at 6, 498 S.W.3d 315, 319.

[25]*Broderick v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 771, 358 S.W.3d 909.

FSW Ryan also reported concerns about Taylor's mental health. She testified that Taylor admitted she was having a hard time and was looking for places in Michigan to put MC. Ryan stated that when she asked MC about the laceration on his nose, he said Taylor had punched him and that MC additionally reported being "drained" in the bathtub by Taylor, which he proceeded to demonstrate by placing a doll face down.[26] Ryan also stated that Taylor's sudden change in behavior was a concern.

There was evidence presented at the adjudication hearing, including the testimony of two police officers and an FSW investigator, all of which the circuit court deemed credible, to meet the burden of proof in a dependency-neglect proceeding. The totality of the evidence is sufficient to find that MC is at substantial risk of serious harm such that it supports a finding of dependency-neglect.

Because the findings of the circuit court are supported by a preponderance of the evidence, we affirm the circuit court's finding that MC was dependent-neglected.

Affirmed.

ABRAMSON and GLADWIN, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.

---

[26]Although, on appeal, Taylor refers to this testimony as hearsay, there was no objection made when it was presented at the adjudication hearing.