Cite as 2025 Ark. App. 146

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-24-766

| | |
|---|---|
| CHARLOTTE TURNER | Opinion Delivered March 5, 2025 |
| APPELLANT | APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. 73JV-24-134] |
| V. | |
| | HONORABLE MARK PATE, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | AFFIRMED |
| APPELLEES | |

## WENDY SCHOLTENS WOOD, Judge

Charlotte Turner appeals an order adjudicating her teenage daughter dependent-neglected. In addition to challenging the sufficiency of the evidence to support the adjudication, she also asks us to review and reverse "any independently errant findings" even if we affirm the adjudication. We affirm the court's order.

This case began on March 21, 2024, when the Arkansas Department of Human Services (DHS) received and investigated a hotline report regarding MC (02/25/09) and her inability to perform daily living activities due to complications from an eating disorder. According to the affidavit attached to the petition for dependency-neglect, Turner told Dustin Langley, the family-service worker who initially investigated the report, that she did not know when MC had last eaten a full meal and that MC had been struggling with her

weight for "a year or so." Turner also explained that MC was not in school because she was so weak that she could not walk long enough to make it through a school day.

On April 5, two weeks after the investigation began, Turner took MC to the White County Medical Center emergency room due to excessive vomiting followed by difficulty breathing after contracting a virus. MC was then transferred to Arkansas Children's Hospital (ACH), where she was found to be suffering from starvation ketosis, profound electrolyte abnormalities, and severe malnutrition. Dr. Kelly Curran, ACH's chief of adolescent medicine, explained to DHS that when MC arrived at ACH, she weighed seventy pounds, was so malnourished that she was bed bound, had a BMI of 12.9, and was "lucky to be alive" given her weakened state. The expected BMI for a child this age is 20. Dr. Curran said that a bone scan showed irreversible bone damage and density loss. MC was diagnosed with avoidant restrictive food intake disorder, which is characterized by severe restrictions in food intake and fear and anxiety around eating certain foods. Physicians at ACH said that treatment for the disorder requires maintaining intake of a high-calorie diet to address the malnourished state and ongoing mental-health support to revise the patient's thought process concerning food. Caregivers and providers must reinforce positive messaging concerning food intake.

Dr. Curran said that MC's treatment upon release would require parental support. The ACH medical staff reported that during MC's treatment from April 5 through May 13, Turner did not appear to have the capacity to make sound and reasonable medical decisions for MC, and the staff expressed concern regarding whether Turner would follow through on

2

the treatment plan when MC was at home with her. According to Dr. Curran, Turner claimed that MC was allergic to certain foods when she was confirmed not to be; told MC that there were toxins in some of the foods provided by ACH; told the staff they were "torturing" MC; and made statements in front of MC causing MC to be fearful of eating. Dr. Curran stated that throughout MC's hospital stay, Turner continued to deny that MC was malnourished. ACH restricted Turner from contact with MC on two occasions due to her disruptive behaviors and comments.

The affidavit included excerpts of medical reports from Dr. Liza Murray, a child-abuse pediatrician who works at ACH on the Team for Children at Risk. Dr. Murray diagnosed MC with medical neglect and suspected psychological abuse. Her reports contain numerous daily examples documented by nurses, social workers, and other medical personnel in which Turner said they were "trying to kill" MC, refused food and treatment for MC, and continually undermined MC's treatment plan. Dr. Murray noted that Turner continued to disbelieve the diagnosis and to resist MC's treatment, which she thought was contributing to MC's fear of the treatment she needs. In a report dated May 13, Dr. Murray said that Turner's counterproductive, neglectful, and abusive behaviors "have worsened despite ongoing education and attempted engagement by the medical team."

In a May 13 Zoom conference, ACH staff conveyed to DHS that Turner did not have the capacity to make sound and reasonable medical decisions, prompting DHS's decision to exercise an emergency hold on MC. On May 16, DHS filed a petition for dependency-neglect, which the court granted the next day.

The court held an adjudication hearing on July 26 but did not issue an oral ruling until August 15 so that it could review the voluminous medical records. Three members of MC's medical team testified at the hearing: Dr. Murray; Cynthia Jones, the social worker assigned to MC's case; and Katie Wilson, a registered nurse. All three testified about Turner's pattern of behavior demonstrating resistance to treatment, reinforcement of false beliefs about food, and claims that the hospital was trying to kill MC. According to Jones and Wilson, when Turner was not present, MC was happier and seemed less anxious, ordered food and finished her meals on her own, and was more interactive with the treatment team. Wilson reported that MC gained thirty pounds while at ACH and weighed one hundred pounds when she left ACH.

Dr. Murray testified that MC's eating disorder is a "disregulated approach to food" that can be accompanied by very restrictive behaviors and rules around food and is not driven by body image as some disorders are but by her relationship to food, specifically fear about food with rigid ideas about what food is okay to eat and what food is not okay to eat. She said that an appropriate caregiver should notice, as abnormal, the appearance of malnutrition and, more importantly, the weakness and inability of the child to participate in regular activities. Dr. Murray testified that Turner's pattern of behavior as documented by ACH staff reinforced MC's false beliefs about food and constituted psychological maltreatment.

MC testified that her mother is a "good person" and that she wanted to go home to her mother. MC recognized that she had an eating disorder because she was a "very picky"

eater, and she admitted that she was eating well in her foster home. She stated that she was doing better with her "eating structure" since she left the hospital. She said she had a "bad memory" and could not remember the last time she attended school, but she thought she had attended eighth grade for "a little bit" several years ago. She said that during the COVID pandemic, she was home schooled, but her mother lost the password to the home-school program, so she had not been home schooled in a long time. She said she had gotten different "apps" and answered questions about history and science before she was admitted to the hospital.

Turner testified that she did not believe ACH treated MC "equal" like it treated the other patients; that her room was dirty, which bothered MC; that she got upset because MC's stomach hurt all the time; and that she kept asking the staff to "check it out." She claimed that she was not interfering but merely trying to help her daughter get better care. She denied she had been worried about toxins in the hospital food. She also testified that she had regularly been taking MC to see Dr. Gustke, MC's primary care physician, for over a year to treat her nutritional issues, but she could not recall exactly when the appointments were or explain why she did not take MC to the hospital sooner when she was not getting better. Although Turner testified that MC was weighed at each of her appointments with Dr. Gustke, Turner could not recall how much she weighed at any of these appointments. She said MC attended some school in the eighth grade but had not attended in the past two years. She claimed that MC was "home schooled," but she could not explain the particular curriculum. Finally, Turner said she did not deny that MC had an eating disorder but merely

denied that she was "the type that goes in the bathroom and throws up." She said MC is a picky eater.

The court adjudicated MC dependent-neglected due to medical neglect, a suspicion of psychological abuse, educational neglect, and parental unfitness, specifically finding the ACH witnesses credible and Turner "nonresponsive at times, confusing at times, and lack[ing] credibility." The court also found that Turner "refused to or was unable to make safe medical decisions" for MC and that she showed a pattern of behavior demonstrating resistance to treatment, psychological maltreatment, and reinforcement of false beliefs about food. The court's order contains over two pages of detailed examples from the ACH witnesses' testimony and medical records. The court specifically noted that Turner was unable to testify about how often, when, or for what period of time MC was seeing her therapist or her primary-care doctor about her medical issues or what MC weighed at any of her primary-care appointments. The court also found concerning Turner's testimony that MC was so weak at one appointment that she had to be put in a wheelchair, yet Turner did not seek any additional treatment, healthcare, or opinions. The court found that return to Turner's custody was contrary to MC's welfare but set the goal as reunification. The court allowed visitation at the discretion of DHS with increased contact so long as Turner did not discuss topics related to food, medical issues, MC's treatment, or ACH or its staff. Turner appealed.

Turner first contends that the court erred in adjudicating MC dependent-neglected. A dependent-neglected juvenile includes any juvenile who is at substantial risk of serious

harm as a result of abuse, neglect, parental unfitness, or sexual abuse or exploitation to the juvenile, a sibling of the juvenile, or another juvenile. Ark. Code Ann. § 9-27-303(17)(A) (Supp. 2023). A finding of dependency-neglect occurs without reference to whether a particular parent committed the acts or omissions that caused the dependency-neglect; rather, the juvenile is simply dependent-neglected. *Araujo v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 181, at 4, 574 S.W.3d 683, 686. Because of this, the focus of an adjudication hearing is on the child, not the parent; at this stage of a proceeding, the Juvenile Code is concerned with whether the child is dependent-neglected. *Link v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 569, at 13, 680 S.W.3d 724, 732.

The purpose of an adjudication hearing is to determine whether the allegations in the petition are substantiated by the proof. *Raynor v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 263, at 7, 646 S.W.3d 406, 411. Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2)(A)(ii) (Supp. 2023). We will not reverse the circuit court's findings unless they are clearly erroneous. *Maynard v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 82, at 5, 389 S.W.3d 627, 629. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Ark. Dep't of Hum. Servs. v. Walker*, 2016 Ark. App. 203, at 2, 489 S.W.3d 214, 216. In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *McCord v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 244, at 8, 599 S.W.3d 374, 379.

The court adjudicated MC dependent-neglected due to medical neglect, a suspicion of psychological abuse, educational neglect, and parental unfitness. Under section 9-27-303(37)(A), the definition of neglect includes

> (ii) Failure or refusal to provide the necessary food, clothing, shelter, or medical treatment necessary for the juvenile's well-being, except when the failure or refusal is caused primarily by the financial inability of the person legally responsible and no services for relief have been offered;

> (iii) Failure to take reasonable action to protect the juvenile from abandonment, abuse, sexual abuse, sexual exploitation, or neglect when the existence of this condition was known or should have been known, and, if for abuse or neglect, the failure to take reasonable action to protect the juvenile causes the juvenile serious bodily injury;

> (iv) Failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile;

> (v) Failure to provide for the juvenile's care and maintenance, proper or necessary support, or medical, surgical, or other necessary care;

> . . .

> (ix)(*a*) Failure to ensure a child between six (6) years of age and seventeen (17) years of age is enrolled in school or is being legally home-schooled; or

> (*b*) As a result of an act or omission by the parent, custodian, or guardian of a child, the child is habitually and without justification absent from school.

Ark. Code Ann. § 9-27-303(37)(A).

"Parental unfitness" is undefined in the Juvenile Code; however, we have held that facts supporting abuse and neglect may also support a finding of parental unfitness. *Taylor v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 36, at 9, 659 S.W.3d 703, 709. Parental unfitness is not necessarily predicated upon the parent's causing some direct injury to the child in

8

question. *Heggins v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 45, at 12, 659 S.W.3d 716, 723. Such a construction of the law would fly in the face of the General Assembly's expressed purpose of protecting dependent-neglected children and making those children's health and safety the Juvenile Code's paramount concern. *Taylor*, 2023 Ark. App. 36, at 9, 659 S.W.3d at 709. The Juvenile Code's goal is to prevent abuse of children, if possible, before it occurs. *Id.*, 659 S.W.3d at 709.

Although the circuit court found that four grounds support its dependency-neglect finding, only one ground is necessary. *Garner v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 328, 603 S.W.3d 858. Here, the evidence presented supports the circuit court's finding of medical neglect. Dr. Murray testified that MC presented to ACH so severely malnourished that she had permanent loss of bone density. Also, in addition to the diagnosis of avoidant restrictive food intake disorder, Dr. Murray had diagnosed MC with medical neglect.[1] Jones, the hospital social worker assigned to MC, testified that Turner voiced daily concerns that the medical team was harming MC and that when Turner was not present, MC was happier and seemed less anxious, ordered food and finished her meals on her own, and was more interactive with the treatment team. The court specifically found Dr. Murray and Jones credible. Moreover, the court reviewed over nine hundred pages of medical records from the six-week period that MC was treated at ACH, which included daily examples of Turner's resistance to, and interference with, MC's treatment. Over a month after MC's admission to

---

[1]The circuit court recognized Dr. Murray as an expert in the area of child abuse and neglect.

ACH, Turner continued to tell medical personnel that MC did not have an eating disorder and that they were "torturing" MC. We have held that the failure or refusal to provide the necessary medical treatment to a child is sufficient evidence of neglect. *Schneider v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 455, at 21. We hold that the record supports the circuit court's finding of dependency-neglect based on medical neglect.

Because we conclude that DHS adequately proved medical neglect, we need not discuss the remaining grounds found by the circuit court, and we decline Turner's overly broad request to review "any independently errant findings."

Affirmed.

KLAPPENBACH, C.J., and BARRETT, J., agree.

*Elizabeth James*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.