Cite as 2020 Ark. App. 244

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CV-19-947

| | |
|---|---|
| ANGEL MCCORD<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | **Opinion Delivered:** April 22, 2020<br><br>APPEAL FROM THE GREENE COUNTY CIRCUIT COURT [NO. 28JV-19-150]<br><br>HONORABLE BARBARA HALSEY, JUDGE<br><br>AFFIRMED |

## RITA W. GRUBER, Chief Judge

Appellant Angel McCord appeals an order adjudicating her daughters, KM and MJ, dependent–neglected. She argues three points on appeal, each challenging the sufficiency of the evidence to support the adjudication. We affirm.

On May 31, 2019, the Arkansas Department of Human Services (DHS) exercised an emergency seventy-two hour hold on KM (09/03/16) and MJ (09/14/12) due to KM's having severe physical injuries. DHS filed a petition for emergency custody and dependency-neglect on June 3. The petition was supported by the affidavits of Jenny Sims, a family service worker, and Andrea Burns, an investigator for the Arkansas State Police Crimes Against Children Division (CACD), describing their investigations of KM's injuries. An order for emergency custody was entered on June 5, and a probable-cause hearing took place on June 6. The circuit court found probable cause that the emergency conditions requiring removal of KM from the custody of appellant continued and necessitated that KM

continue in DHS custody. The court ordered that MJ remain in the custody of her father, Jerry Johnson, with DHS's protection plan to remain open.

At the August 7 adjudication hearing, Andrea Burns of the CACD testified that she began an investigation on May 29, 2019, following a report of medical neglect on appellant and Zachary McCord (KM's father), and for abuse regarding a bone fracture for an unknown offender. Burns, who first met appellant at Le Bonheur Children's Hospital in Memphis, stated that KM had bruises "all over her body," including her back, stomach, arms, and legs, which appellant explained were the result of frequent falls, including a fall down the stairs. In her experience, Burns did not think the bruising was consistent with appellant's explanation. In addition, Burns observed that KM had a finger splint, which appellant claimed was a crush injury from KM's slamming her finger in the door. Burns testified that she visited the home and found it hard to understand how KM could have slammed the door on her finger. Burns said that appellant indicated she was not home at the time of the injuries but that a friend, Makala Robertson, was babysitting. Burns spoke to Robertson at the hospital, and Robertson told her that she was in the kitchen, heard KM scream, and found that KM had slammed her finger in the door. Burns also spoke with MJ, who was also home at the time of KM's injury. MJ did not have any injuries.

As a result of the investigation, Burns made a true finding on appellant for medical neglect because appellant did not immediately take KM to the doctor after her finger was crushed in the door, explaining that KM was seen for a wellness visit three days after the injury and was sent to the hospital. Burns also stated that appellant indicated she treated KM's injury with antibiotic ointment. In addition, Burns made a true finding for abuse

2

regarding a bone fracture on an unknown offender because it could not be determined who smashed KM's finger in the door or how KM's finger had been crushed. Burns also noted that she could not determine what caused all of KM's bruising but that it appeared to be signs of abuse. Burns testified that the hospital released KM to appellant but that DHS conducted a safety inspection shortly after appellant arrived home.

Ginny Sims, the family service worker assigned to the case, testified that she completed an investigation that led to the removal of KM and MJ. She was called out by CACD for a safety check on May 30, 2019, and implemented a protection plan with appellant. Sims spoke with appellant about KM's injuries and behavior. Sims noticed KM had a black eye, numerous bruises, and a large bandage on her finger. During the investigation, appellant told Sims that she learned from the hospital that KM had a fracture on her right wrist but that the hospital did not know when it occurred because it was in the healing stages. Sims testified that appellant thought the injuries could have occurred when KM was waking up in the middle of the night throwing fits and told her that KM would fall out of the bed and they would find her in random places. As for the finger injury, appellant told Sims that KM smashed her finger in the door and that she already had a doctor's appointment set up for KM's behavioral issues in waking up in the middle of the night. It was at this appointment that KM was taken to the hospital by ambulance.

Sims learned that appellant's boyfriend, Ethan Kurck, had been living in the home for one month. She screened both appellant and Kurck for drugs, and both tested positive for THC. The protection plan put in place on May 30 required appellant to ensure no unsupervised contact between Kurck and the children, to move furniture for KM's safety,

3

and to keep a line of sight on KM at all times, including having KM sleep beside her in case she woke up in the middle of the night. The plan also provided that appellant and Kurck would not use any physical punishment during the investigation. During this time in the home, Sims observed that KM appeared fearful of Kurck as she pulled away from him dramatically "towards her mother in fear" when he brought KM a towel after she vomited. Sims learned from appellant that KM's behaviors when waking up at night began within the time frame that Kurck had moved in the home.

Sims explained that the following day, appellant was supposed to bring both children to the Children's Advocacy Center (CAC) in Jonesboro to be interviewed but instead sent MJ to school and called to say KM had a high fever and would not be going to the CAC. This prompted Sims to speak with a nurse practitioner from Le Bonheur, and Sims took KM to Le Bonheur because of concern of "necrotic fever infection" as a result of the finger injury. Sims indicated that hospital personnel feared KM might require surgery and possibly lose her finger, but that KM was hospitalized for three days where she was monitored and given antibiotics.

Sims stated that DHS decided to take a hold on the children on May 31 after a meeting at the office with her supervisors where they discussed KM's new bruises as compared to the ones noted in the investigation of Alexia Covington based on a prior hotline report about two weeks earlier. The prior investigation was unsubstantiated for cuts, bruises, and welts. Sims indicated that the child's hematoma on the head, the wrist fracture, the finger injury, and the bruising all down the leg were discovered since Covington's

4

investigation. Sims stated that there had been no report of injuries since KM had been in foster care.

At the hearing, appellant testified that the day KM got a black eye, KM had gotten up in the middle of the night. Appellant found her on the floor underneath the bed and assumed KM had hit her eye on the dresser. As for KM's finger injury, appellant explained that she was at a hair appointment that day and found out from Robertson when she returned home that KM had slammed her finger in the door. Appellant said that she had been a dermatologic surgeon tech for five years and knew how to care for KM's injury, indicating that she did not need to take her to the doctor at that time. She removed the bandage placed by Robertson and applied antibiotic ointment that had been used for a recent staph infection KM had on her toe. Appellant said the infection was from daycare. In addition, appellant stated that the finger injury occurred on a Monday and that KM had a scheduled doctor's appointment on Wednesday because of her recent behavioral issues.

When questioned about KM's bruises, appellant said, "She plays hard. We play outside every day after school. We go outside and we grill. She has a sister, they play. She has bunk beds. She climbs up and down the stairs. She's a two year old." As for the fractured wrist, appellant stated that KM "did fall off of the stairs" in April 2019 after they moved into their new house, suggesting it was the only incident that could have caused the injury but that KM never acted like anything was broken.

Appellant testified that Kurck moved into the home in May 2019 but would stay overnight some beginning in February or March prior to moving in. Appellant said that Kurck continued to live with her. Appellant denied that KM pulled away from Kurck as

5

Sims described but said KM was just clinging to her because she did not feel good. Appellant stated that she has never seen KM fearful of Kurck. Appellant added that KM was only alone with Kurck if he picked her up from daycare, but she would be home when he arrived. The only other time the children could have been alone with Kurck was when appellant was in the shower.

Ethan Kurck also testified at the adjudication hearing. He had known appellant for eight months at the time of the hearing and had lived with her since the middle to the end of May but said he was not there when KM injured her finger. He testified that on the afternoon of the finger injury, he and appellant went to the lake with their children. He was not aware of any physical issues with KM prior to the finger injury except the staph infection on her toe. Kurck testified about KM's waking in the middle of the night. He stated that he woke up around 4:00 am to go to work and had to walk through the girls' bedroom to exit the house. Kurck testified that he would see KM under the bed and let appellant know. He also helped KM get back in bed a couple of times. He agreed that KM's behaviors of getting up at night began around the time he moved into the home.

Kurck testified that he was at the home when they returned from Le Bonheur and participated in the protection plan. He stated that he moved furniture and started parenting classes. He recalled that when he grabbed a towel for KM after she threw up, KM did not "want him there" at that moment. He added that when KM is sick, she never wants to go to him. Kurck testified that he has never seen appellant hurt the children or do anything that would put them at risk. Kurck also testified that he did not watch the children alone except when appellant was in the shower or in another room.

6

Kurck said he has three children of his own, ages six, five, and one. He said the children do not come to his home because he has supervised visitations. He claimed he agreed to "papers" with standard visitation, but he did not show up at court and different papers were entered with supervised visitation at his ex-wife's discretion.

In its oral ruling, the circuit court made the finding of dependency-neglect based on physical injuries to the child without a named offender. The court stated, "I have a child with too many injuries, and she is too small, and she has too many behavioral problems that have been going on for a month or so before the physical injuries came to the attention of Le Bonheur. And I don't know why she has these injuries." The court did not "buy mom's argument that [KM's] just a two year old who plays rough." The court mentioned that it had questions as to why Kurck had supervised visitations with his own children. The written order was entered on September 24, 2019, and appellant filed a timely notice of appeal on October 7, 2019.

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9-27-327(a)(1)(A) (Repl. 2015). Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2)(ii). We will not reverse the circuit court's findings unless they are clearly erroneous. *Maynard v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 82, at 5, 389 S.W.3d 627, 629. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Ark. Dep't of Human Servs. v. Walker*, 2016 Ark. App. 203, at 2, 489

S.W.3d 214, 216. In reviewing a dependency–neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Id*.

Arkansas Code Annotated section 9–27–303(18)(A) provides: "'Dependent-neglected juvenile' means any juvenile who is at substantial risk of serious harm as a result of the following acts or omissions to the juvenile, a sibling, or another juvenile: (i) Abandonment; (ii) Abuse; (iii) Sexual abuse; (iv) Sexual exploitation; (v) Neglect; (vi) Parental unfitness; or (vii) Being present in a dwelling or structure during the manufacturing of methamphetamine with the knowledge of his or her parent, guardian, or custodian." Included within the definition of abuse is any injury that is at variance with the history given or any nonaccidental physical injury. Ark. Code Ann. § 9–27–303(3)(A)(iv) & (v). The definition of neglect includes the failure to provide for the juvenile's medical care. Ark. Code Ann. § 9–27–303(36)(A)(v). The definition of a "dependent-neglected juvenile" includes any juvenile who is at substantial risk of serious harm as a result of parental unfitness. Ark. Code Ann. § 9–27–303(18)(A)(vi).

For her first two arguments on appeal, appellant argues that (1) "physical injuries" is not sufficiently specific to support a basis for dependency-neglect, and (2) even if this court attempts to draw inferences as to what type of "physical injuries" the circuit court believed KM to have, the record is void of any evidence demonstrating the types of injuries that are required to support a finding of dependency-neglect. While appellant addresses these arguments separately, we address them together as a challenge to the sufficiency of the evidence to support the adjudication.

8

Appellant contends that the circuit court's finding "physical injuries to [KM] without a named offender" is insufficient to support the adjudication of dependency-neglect. She argues that "physical injuries" is not sufficiently specific to support a basis for dependency-neglect.

Here, the circuit court based its dependency-neglect finding on physical injuries with an unknown offender. Appellant argues that the term "physical injuries" is "too vague to satisfy any of the specific definitions in the code." Appellant further contends that the circuit court's oral remarks "are telling and likely the reason why the court could not fit the facts to any specific definition, because the court *did not have sufficient evidence to find anything specific*." (Emphasis supplied.) Appellant also suggests that the court created its own "catch all" basis of "physical injuries." Appellant cites *Jones v. Arkansas Department of Human Services*, 2011 Ark. App. 632, for the proposition that a circuit court cannot force facts into an inapplicable statutory ground in an effort to make findings work. In that termination-of-parental-rights case, we cautioned the judiciary that courts "may not alter or disregard the language of a legislatively enacted ground for termination. If the ground, as worded, does not fit the language of the case, it should not be used." *Jones*, 2011 Ark. 632, at 3. There, the circuit court used a ground for termination that required the child to be out of the home for twelve months, but because the case had been fast-tracked, the child had been out of the home for only seven months.

This is not a termination case, and the circuit court did not disregard statutory language. This court has stated that a lack of a reference in the order to an injury at variance with the history given is of no consequence, as this court may utilize a circuit court's oral

9

pronouncements to determine the intent behind its written orders. *Ward v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 491, at 4. In the present case, it is evident that the circuit court found the children dependent-neglected based on physical injuries at variance with the history given. There was ample evidence by which the court could and did find the children dependent-neglected.

The evidence demonstrated that KM had numerous injuries that appellant was unable to explain and attributed to KM's being a toddler and throwing tantrums. Andrea Burns, the CACD investigator, testified that in her experience, appellant's explanation of the bruises "did not match the injury." Likewise, Burns indicated that "the bruising was more of handprints, fingerprints, not—markings like falling down the stairs." Burns expressed doubt that KM's finger injury resulted from KM's finger being crushed in the door. Based on the photographs and seeing KM personally, Burns testified that there were signs of physical abuse. Burns made a true finding for abuse (bone fracture) on an unknown offender. The circuit court did not find credible appellant's explanation of KM's injuries as it stated, "I just cannot buy mom's argument that she's just a two year old who plays rough." The court was also concerned with KM's new behaviors in waking up in the middle of the night that appellant suspected was the cause of some of the injuries and which started about the time Kurck moved into the home.

Much of appellant's argument amounts to raising questions regarding the evidence such as (1) if KM was being abused, why would appellant take pictures of her injuries prior to DHS's involvement; (2) Investigator Burns attempted to prove KM's finger was not injured by being crushed in the door but Burns could not recall which hand was involved;

10

(3) there was no medical evidence introduced; (4) claims that the photographs showed small bruises that one would ordinarily see in small children, not massive contusions; and (5) there was speculation that Kurck abused KM even though MJ had no injuries when he was in the home, and Kurck had no unsupervised access to the children to cause the injuries. In making these assertions, appellant is essentially asking this court to reweigh the evidence. The circuit court's weighing the evidence differently than appellant wanted it to be weighed is not reversible error. *Posey v. Ark. Dep't of Health & Human Servs.*, 370 Ark. 500, 509, 262 S.W.3d 159, 166–67 (2007). We do not act as a super fact-finder nor do we second-guess the circuit court's credibility determinations. *Parish v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 552, at 14, 532 S.W.3d 121, 129.

In their response to appellant's argument, appellees also argue that the record supports a determination of dependency-neglect based on medical neglect. While the court only found the children dependent-neglected based on KM's physical injuries, the evidence would support a finding of dependency-neglect based on medical neglect. *See Churchill v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 530, at 11, 423 S.W.3d 637, 642 (stating that "in our de novo review, we could hold alternatively that other grounds for dependency-neglect were met").

Here, the CACD investigator made a true finding for medical neglect. There was evidence that appellant did not take KM to the doctor for her finger injury but waited because she had an appointment already scheduled two days later to address KM's recent behavioral issues. When KM was at this appointment, the doctor sent KM to Le Bonheur by ambulance for this injury. Ultimately, this injury required KM to stay in the hospital

several days because of fears of "necrotic fever infection," need for surgery, and loss of the finger. Here, the circuit court in its oral ruling questioned appellant's credibility noting that she took KM to the lake after her finger injury in spite of her claim that she knew how to care for KM's finger injury based on her dermatologic tech experience.

For her third point on appeal, appellant argues that it was "error for the court to enter what can only be characterized as a shell judgment—one entered without sufficient evidence but followed by orders for further investigation in an effort to justify the judgment entered." This argument is also a challenge to the sufficiency of the evidence to support the dependency-neglect finding. As stated previously, the record supports the court's finding of dependency-neglect. The court's further order of a trauma assessment for KM in an effort to identify the offender amounts to a service offered to the family as a result of the dependency-neglect status of the children. A finding of dependency-neglect does not require that an offender be named. *Merritt v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 552, at 4, 473 S.W.3d 31, 34 ("An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected."); *see also Ward*, 2014 Ark. App. 491; *Eason v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 507, 423 S.W.3d 138 (affirming adjudications of dependency-neglect involving physical abuse by unknown offender).

We hold that the circuit court's finding the children dependent-neglected is not clearly erroneous and affirm the adjudication order.

Affirmed.

SWITZER and HIXSON, JJ., agree.

12

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Callie Corbyn*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.