Cite as 2023 Ark. App. 365

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-23-89

JAMES MAYER AND ANNA MAYER

APPELLANTS

V.

ARKANSAS DEPARTMENT OF
HUMAN SERVICES AND MINOR
CHILDREN

APPELLEES

Opinion Delivered September 6, 2023

APPEAL FROM THE WASHINGTON
COUNTY CIRCUIT COURT
[NO. 72JV-22-424]

HONORABLE DIANE WARREN,
JUDGE

AFFIRMED

## RITA W. GRUBER, Judge

James Mayer and Anna Mayer (collectively "the parents") appeal the November 27,

2022 order of the Washington County Circuit Court adjudicating their three children, MC1

(born January 2017), MC2 (born December 2017), and MC3 (born October 2019)

dependent-neglected. The parents, in a joint brief, raise three points on appeal: (1) there was

insufficient evidence to adjudicate the children dependent-neglected; (2) the court erred

when it denied the motion for directed verdict; and (3) the court erred by finding that the

Arkansas Department of Human Services (DHS) had made reasonable efforts to prevent

removal. We affirm.

### I. *Background*

On August 1, 2022, DHS filed a petition for dependency-neglect and emergency

custody of MC1, MC2, and MC3. The petition alleged that the children were dependent-

neglected due to a substantial risk of serious harm on the bases of abandonment, abuse, neglect, sexual abuse, sexual exploitation,[1] or parental unfitness. It requested a writ of assistance so that local law enforcement could assist in removing physical custody of the children from their parents.

The petition was supported by an affidavit from family service worker (FSW) Stacie Warren. The affidavit set out in relevant part that MC1 had been absent from school Thursday and Friday (July 21 and 22); no bruising had been observed prior to those absences; bruising was first observed when he returned to school on the following Monday; MC1 relayed that his dad had hit him with a belt; DHS was notified; and Warren went to the school to investigate on July 28. The affidavit also set out the family's history with DHS and the difficulty it had gaining physical custody of the children.

In the August 1 ex parte order for emergency custody and writ of assistance, the court found that there was probable cause to believe that the children were dependent-neglected, and it was contrary to the welfare of the juveniles to remain with the parents. The court ordered that the children be placed in DHS's custody and directed local law enforcement personnel to assist DHS in effectuating their removal from the home. A probable-cause hearing was held on August 4, at which Warren's affidavit was entered into evidence. The probable-cause order was entered, reflecting that the court placed legal custody of the children with DHS on August 1; the family was located in Kansas on August 3; and DHS

---

[1]The record contains no other references to any sexual conduct in connection with the children.

2

obtained physical custody of the children on that date with the assistance of police. The court found that James had established paternity and is a parent of all three children; probable cause continued to exist; and it was in the children's best interest to continue in DHS custody. The court ordered supervised visitation and set an adjudication and disposition hearing for September 13.

On September 13 and 27, the adjudication and disposition hearing was held. Anna testified that she did not know what happened to MC1 because she was hospitalized during the time MC1 was alleged to have been injured. She explained that she had not been aware of the emergency order placing her children in DHS custody. DHS showed up multiple times; she let them in once, but not other times because she had been advised by her lawyer not to speak to them. She spoke to two of the witnesses, Autumn and Amanda, about their testimony because they are her friends but not in an attempt to influence their testimony. They told her that her son had gotten into a fight and had fallen. She offered to use her food stamps to buy Autumn and Amanda groceries because they had watched and fed her children for two weeks in June. She had given MC1 a bath on Monday morning (July 25) and did not see any marks on him.

James testified next. He drove a "semitruck" for J.B. Hunt, but only within 150-mile radius of his location. He also resides in the semitruck. He regularly went to his wife's residence to watch and see the children. He spent an entire week with the children while Anna was hospitalized. He disciplines his children using time out and spankings, and the "seriousness" of the discipline depends on how many times the same rule has been broken.

When he spanks his child, he only gives one swat with an open hand on the butt and does not use discipline that causes bruises. He started using physical discipline when MC1 was five.

FSW Warren testified that she conducts investigations into child-maltreatment allegations for DHS and had received a referral regarding allegations that MC1 had large bruises on his stomach and right thigh. She went to MC1 and MC2's school on July 28, spoke with MC1, and viewed and took photos of the bruising, five of which were admitted into evidence. She believed that the injuries occurred around the previous Thursday or Friday (July 21 and 22) due to the color of the bruises and because MC1 had been absent from school those days. MC1 did not need medical treatment for his injuries, and the other two children had none. Warren went to Anna's home that same day and spoke to Anna and then James. Different explanations were provided for MC1's injuries: a neighbor hit MC1 with a bat; he fell down a hill; and he fell on a bike bar. Anna told Warren that MC1's absences were due to his smearing feces around the house and having potty-training issues. Warren told Anna that a protective-services case could be opened and services offered, including weekly visits in the home. Anna responded that Warren was not going to come into her home weekly, and she had spoken to an attorney. James and Anna then left with MC3 and picked MC1 and MC2 up from school. The decision to place an emergency hold was made, and when Warren returned to the apartment to do so, Anna refused to answer the door.

Warren testified further that she went to the home the same day the emergency order was entered to take physical custody of the children but was unsuccessful, despite contacting the Fayetteville Police Department (FPD) for assistance. The officers did not remove the children. While Anna may have been under the impression that she did not have to hand over the kids, she believed Anna had been shown the order. She believed that the parents fled the house and the state, and the children were ultimately picked up in Kansas on August 3. Warren was aware Anna was hospitalized until July 23. However, the children needed to be taken into DHS custody due to the bruising on MC1 and the failure to protect by Anna, as evidenced by her lack of concern and implausible explanations for the bruises. Warren testified that DHS's findings were true for abuse with physical injury without justifiable cause with the alleged victim being MC1 and the offender being James, as well as failure to protect all three children, with Anna as the offender.

Autumn Kennedy testified next via Zoom. She was the apartment manager where Anna and James had resided, and their children were friends. Regarding MC1's bruises, Anna told Autumn that James hit MC1 with a spatula because he smeared poop in the bedroom but that Autumn needed to say that MC1 had gotten hurt by Autumn's son while at her house. Anna offered to buy Autumn food with her food stamps during the same conversation in which they discussed Amanda's testimony, but Autumn refused the offer. Autumn had taken care of and fed Anna's children in June. Autumn last saw the children when she picked Anna up from the hospital and took her home, but she had not seen any bruises on MC1 or MC2.

Amanda Wawrzaszek testified. She and Anna have attended church together for the last three and a half years and had been neighbors for two and a half years. Regarding MC1's bruises, Anna told Amanda that James had grabbed objects—a kid's golf club and then a belt—and openly started swinging and beating on MC1. Anna asked Amanda to say that James brought the kids to Amanda and Autumn on Thursday; a child had pushed MC1 down the stairs; and the injuries took place while MC1 was in their care when Anna was hospitalized, none of which was true. Anna offered to buy Amanda food using her food stamps during the same conversation in which she was talking about Amanda's potential testimony.

Detective Cody Strange of the FPD testified that he had been conducting two investigations regarding the parents. The first was a battery investigation in connection with the bruising to MC1, which he referred to the Washington County Prosecutor's Office for a charging decision. Strange never saw MC1 personally, but he reviewed photographs that showed bruising to the right torso of a child that Warren had identified to him as MC1. He was unaware the battery charge had been filed. The second investigation involved the flight from DHS and the court order and concluded with the parents' arrest on August 5. His decision to arrest them was based on the court order stating that DHS was now the primary custodian of the children; multiple attempts to serve the order on the family; extreme opposition to that order being served; and Anna fleeing the state from DHS and crossing states lines.

Anna moved for a directed verdict, arguing that the evidence was insufficient to prove any emergency, child maltreatment, or any serious physical injuries that required placing a hold since Anna was in the hospital when the injuries to MC1 occurred. Anna argued that the pictures only show a body part; it could not be concluded that the pictures were, in fact, of MC1; and the bruising did not appear to be severe. The other two children were not hurt in any way, and no one knows how or when the bruises happened, who caused the bruises, or if any instrument was used to cause the bruises. Anna further argued that there was no allegation in the DHS petition that the parents fled the jurisdiction of the court knowing there was a court order in place, so whether they fled should not be taken into consideration by the court. James joined the motion for directed verdict, arguing additionally that no emergency necessitating removal existed given that the law enforcement officers who were at the home refused to assist with taking custody of the children. James also pointed out that Strange did not make a probable-cause arrest because he thought it was a "thin line" case, and DHS had not established that there was a sufficient injury to warrant emergency removal. The attorney ad litem opposed the motion, arguing that DHS has put on sufficient evidence to survive the directed-verdict motion, given the testimony that the mother told someone the father was swinging and beating on a child with an object, and there were pictures of a serious physical injury.

The court denied the motion. It stated that DHS had established by clear and convincing evidence that on July 28,[2] MC1 had large bruises on his stomach and thigh that were alleged to have been caused by physical abuse by James. An investigation ensued, resulting in a true finding of abuse by James with physical injury and a true finding for failure to protect all three children by Anna. The true findings were based on a determination that MC1 missed school on July 21–22; the bruises were not observed prior to July 21 but were evident when MC1 returned to school on July 25; and the bruises were not transitory in nature. When the parents were interviewed by DHS, they gave multiple explanations for the bruising, none of which DHS or the court found plausible. The court further found that DHS had established that MC1's physical injuries were nonaccidental and caused by James, who had admitted that he used physical punishment, the severity of which depended on the severity of the child's misbehavior; and when MC1 was in James's care, he smeared feces on the wall at his home. Two other witnesses testified that Anna told them that James had committed the act that led to the bruising but asked them to tell a different story to the court. The court found that DHS had previously established that probable cause existed for the removal of the children, and Anna refused to allow DHS into her home when it went to Anna's for that purpose. After DHS was unable to take physical custody once more with police assistance, Anna took the children and fled across state lines. The parents were

[2]Although the trial court referenced a clear-and-convincing-evidence standard of proof, only proof by a preponderance of the evidence is necessary in an adjudication hearing. Ark. Code Ann. § 9-27-325(h)(2)(B) (Supp. 2023).

uncooperative and gave every indication that they would flee with the children. The removal of the children was necessary for their health and well-being and to get necessary services. The court concluded that DHS had established a prima facie case that the children were dependent-neglected.

Anna called Corporal Dan Hutsell of the FPD. He testified that he responded to a call to assist DHS at Anna's apartment on August 1. James was not there. He and other officers received a copy of the order, read through it, and spoke to Anna. She said she did not want to "deal" with DHS that day, but they spoke, and she offered to let him in the apartment. He did not tell Anna that she had to do anything. He could see the three children, who appeared to be happy. The officers and DHS decided that based on the orders, what was taking place, and the availability of other options, they would leave. While the order did state that the FPD was to assist DHS, which he had done previously, the difference this time was that the officers were outside of a residence as opposed to consensually inside.

Anna testified on her own behalf, in part reiterating her previous testimony. Additionally, she testified as follows. She and the children lived in the apartment, and James visited the children there, usually on Friday and Saturday. She was hospitalized for about a week and discharged on July 23 and did not know who was taking care of her children during that time until James relayed that the children had been home with him and had not spent any time with Autumn and Amanda as she had been told. Regarding Amanda and Autumn, Anna testified repeatedly to her belief that they were lying and why. She claimed that Autumn and Amanda initiated the conversations about the abuse allegations and denied

telling them how to testify or that James hit any child with any objects. She denied seeing the bruises, asking MC1 what happened when she came home from the hospital, or knowing how the injuries occurred. She further denied telling any caseworkers MC1 had been hit by a bat by a neighborhood child; had hurt himself while riding a bike; or had fallen down some stairs. She does not have a theory regarding how the injuries occurred. She also denied that Warren explained any type of protective services to her and continued to deny that she fled with the children while DHS was trying to place a hold. She was shown the photos that were admitted into evidence, denied they were of MC1, but then conceded that two of the photos showed a mark on an abdomen that looked like MC1's birthmark. She does not spank her children but is aware that James had spanked MC1 once over the feces incident because he told her he popped MC1 open handed one time on the behind. Neither she nor James are violent people, and she believes her children are safe with them and are happy and healthy.

The court asked Anna if she had asked Amanda and Autumn to be witnesses at the hearing. Anna's attorney clarified that Autumn and Amanda were both called as witnesses that day by DHS, not Anna, and that Anna had asked them to testify before she knew she had been secretly taped and was being set up. The court also confirmed that Anna is still married to James; there is no legal-separation agreement.

James then testified on his own behalf, also reiterating some of his earlier testimony. He additionally testified that around 1:00 or 2:00 a.m. on the Friday in question, MC1 smeared poop on the closet, the walls throughout his room, and on blankets, so James spanked him on his "butt," which left a red mark. James did not know if it bruised, but he

has never noticed any bruising when he watched the children. He testified that the most severe punishment would be an open-handed swat on the "butt," with lesser forms of punishment being loss of TV time or isolation in a room. He was shown the photographs and stated that the bruising shown was not in the place where he had struck MC1. He was present at Anna's apartment when DHS came to investigate, which is when he spoke to a lawyer, who told him he had the right not to speak to anyone from DHS or the police. He never saw a court order authorizing DHS to take custody of the children. He is currently charged with endangering the welfare of a minor, second-degree battery, and violation of a custody or court order—all felonies. He provides financially for Anna and the children by paying the electric and gas bills, paying for fuel, and giving Anna money when she asks for it. Anna does not have direct access to his income of $75,000 annually; she lives on government assistance and receives HUD.

DHS, Anna, and James gave closing arguments as did the attorney ad litem, who argued in favor of the dependency-neglect adjudication. Further testimony was given, and further rulings were made regarding disposition; however, neither Anna nor James appealed the disposition.

In the November 27 adjudication and disposition order, the court found that DHS's contact with the family arose in an emergency situation in which the family was not cooperative and absented themselves from the state of Arkansas, taking the children where preventative services were not possible. The court concluded that DHS had made reasonable efforts to prevent removal. The court determined by a preponderance of the evidence that

the children were dependent-neglected, finding that neither Anna nor James was credible. It further found that MC1 was dismissed from school on July 21 with no bruises; came back to school on July 25 with bruises; and was with James during that time frame. James admitted he had punished MC1 for smearing poop on the walls by "popping him once on the butt," leaving a red mark but not knowing if it bruised. The court also found that MC1's injuries were not accidental or transitory. Regarding Anna, the court found that even if she did not know immediately that James had caused injury to MC1, once she did find out, she did not cooperate with DHS. The court adjudicated MC1 dependent-neglected on the bases of abuse and parental unfitness due to the bruising caused by James and failure to protect by Anna. The court adjudicated MC2 and MC3 dependent-neglected on the bases of abuse of a sibling and parental unfitness due to the bruising on MC1 caused by James. The parents' timely appeal of the adjudication followed.

## II. *Standard of Review*

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9-27-327(a)(1)(A) (Supp. 2023). Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2)(ii) (Supp. 2023). This court will not reverse the circuit court's findings unless they are clearly erroneous. *McCord v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 244, at 8, 599 S.W.3d 374, 379. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that

12

a mistake has been made. *Id.* This court defers to the circuit court's evaluation of the credibility of the witnesses. *Id.*

III. *Points on Appeal*

Before addressing the parents' points on appeal, we must first address their statement of the case. Arkansas Supreme Court Rule 4-2(a)(6) (2022) provides that the appellant's brief "shall contain a concise statement of the case and the facts without argument" and "shall identify and discuss all material factual and procedural information contained in the record on appeal." Here, the statement of the case contains argument rather than a recitation of the facts and procedural history as required by our rules. We are not ordering rebriefing *this time*, because it is not in the children's best interest to do so. We strongly caution the parties to closely read the rules applicable to appeals and follow them.

As to the merits of this case, the parents' first point on appeal is that there was insufficient evidence to adjudicate the minor children dependent-neglected. Their second point on appeal is that the circuit court erred when it denied their motion for directed verdict. Because both points challenge the sufficiency of the evidence, we address them together.

A dependent-neglected juvenile is any juvenile who is at substantial risk of serious harm due to abuse or parental unfitness. Ark. Code Ann. § 9-27-303(17)(A)(ii), (vi) (Supp. 2023). A dependency-neglect adjudication occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected—there is no such thing as a "dependent-neglected parent." *Albright v.*

*Ark. Dep't of Hum. Servs.*, 97 Ark. App. 277, 282–83, 248 S.W.3d 498, 502 (2007). Substantial risk speaks in terms of future harm to the child—not actual harm. *Bean v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 350, at 5–6, 498 S.W.3d 315, 318. Only one basis is necessary to support a dependency-neglect finding. *Garner v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 328, at 5, 603 S.W.3d 858, 861. Arkansas Code Annotated section 9-27-303(3)(A)(iv), (v) defines "abuse" by a parent or guardian, in part, as "any injury that is at variance with the history given" or "[a]ny nonaccidental physical injury." The Juvenile Code does not define "parental unfitness." *Ark. Dep't of Hum. Servs. v. Jackson*, 2021 Ark. App. 464, at 7, 636 S.W.3d 806, 810. Parental unfitness is not necessarily predicated upon the parent's causing some direct injury to the child in question. *Bean*, 2016 Ark. App. 350, at 6, 498 S.W.3d at 318–19.

The abuse of one sibling can establish that another sibling is at a substantial risk of serious harm, even when there is no reason to think that the other siblings have also been actually abused. *Allen-Grace v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 83, at 11, 542 S.W.3d 205, 211. It is the risk of harm that is created by the sibling's abuse that makes a finding of dependency-neglect regarding the other sibling appropriate. *Id.* at 11–12, 542 S.W.3d at 211. Further, it is important to remember that at an adjudication hearing, the focus is on the child, not the parent. *See Johnson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 513, at 5, 611 S.W.3d 240, 243.

In their brief, the parents emphasize that Anna was hospitalized when the injuries were alleged to have occurred and could not possibly be responsible for them. They argue

14

that if MC1 was, in fact, injured, James did not do it; they do not know how or when it occurred; and the bruising was insignificant. They further argue that the FPD's decisions not to take a more active role in the removal of the children or pursue a probable-cause arrest with respect to the battery suggested no abuse occurred and a lack of an emergency. They also point to inconsistencies in Amanda's and Autumn's testimony as well as the lack of a medical expert to opine regarding the bruising. In support of their arguments, the parents rely on *Madore v. Arkansas Department of Human Services*, 2017 Ark. App. 296, 521 S.W.3d 172. *Madore* is inapplicable to this case since it is legally and factually distinguishable. The children in *Madore* were adjudicated dependent-neglected on the basis of neglect due to allegations of having been left alone. *Id.* That is not the issue in this case.

Here, the court specifically found Anna's and James's testimony lacked credibility and found Warren's testimony to be credible. MC1 was at school without bruising, and then was absent from school for two days, during which time he was in the exclusive care of James. James testified that during that time frame, he physically punished MC1 over the feces incident. Upon MC1's return to school several days later, bruising in various stages of healing was discovered. When an investigation was initiated, the parents were uncooperative, gave multiple implausible versions of how the bruising occurred, and then left the state with the children, frustrating DHS's attempts to provide services and take physical custody of the children. Two independent witnesses testified that Anna told them that the bruising—which the court found was not transitory, insignificant, or accidental—was caused by James hitting MC1 with an object. Those same two witnesses testified that Anna asked each of them to

15

give a different explanation for how MC1 was injured. Both parents are facing felony charges in relation to the events in this case. All three children resided with Anna, who testified that although she and James do not currently live together, they remain married, there is no legal-separation agreement, James has access to the children, and he is their sole financial support.

The parents are asking this court to reweigh the evidence and make different credibility determinations. The circuit court's weighing the evidence differently than appellants wanted it to be weighed is not reversible error. *McCord*, 2020 Ark. App. 244, at 11, 599 S.W.3d at 381. We do not act as a super fact-finder nor do we second-guess the circuit court's credibility determinations. *Id.* at 11–12, 599 S.W.3d at 381. We therefore affirm on the first two points.

Finally, the parents assert that the court erred by finding that DHS had made reasonable efforts to prevent removal. They argue that DHS should have left the children with Anna, and it was unreasonable not to do so, given that the alleged abuser—James—did not live in the home, and his contact could have been limited through court order. However, the court determined that an emergency existed, and probable cause was present to remove the children from the home. Further, any attempts DHS could have made to leave the children in the home with Anna prior to removal were thwarted by the parents' lack of cooperation with DHS and leaving the state. The parents also seem to take issue with the circuit court's decision not to return the children to Anna's custody the day of the adjudication hearing; however, the parents appealed the dependency-neglect adjudication only, not the disposition, which is not appealable without a proper Rule 54(b) certification,

16

absent here. As such, the disposition of the children is not properly before this court. *See, e.g.*, *Johnson*, 2020 Ark. App. 513, at 7–9, 611 S.W.3d at 244–45.

When considering all the evidence in this case, we cannot say that the circuit court's finding that all three children are dependent-neglected is clearly against the preponderance of the evidence. Also, we are not left with a firm conviction that a mistake has been committed. Therefore, we affirm the circuit court's adjudication order.

Affirmed.

ABRAMSON and BROWN, JJ., agree.

*Elizabeth Finocchi*, for appellants.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.