2011 Ark. App. 82

**Christina MAYNARD, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
Appellee.

**No. CA 10–1054.**

Court of Appeals of Arkansas.

Feb. 2, 2011.

Leah Lanford, Public Defender, Little Rock, for appellant.

Tabitha B. McNulty, Little Rock, Keith L. Chrestman, Chrestman Group, PLLC, Jonesboro, for appellees.

RITA W. GRUBER, Judge.

Christina Maynard brings this appeal from the order of the Garland County Circuit Court adjudicating her son J.M., born January 3, 2001, dependent-neglected. Maynard's sole point on appeal is a challenge to the sufficiency of the evidence supporting the order. We affirm.

The present case began on May 14, 2010, when a Department of Human Services worker was interviewing Maynard on an unrelated case. During that interview, Maynard admitted that she had taken both Xanax and Valium without having a prescription for either drug. Maynard submitted to a drug screen, testing positive for both methamphetamine and opiates. DHS exercised a seventy-two-hour hold on J.M. DHS filed its petition for emergency custody on May 17, 2010. An order for

emergency custody was entered on May 18, 2010.

Maynard waived a probable-cause hearing. The court returned temporary custody of J.M. to Maynard under the terms of a safety plan where Maynard and her son were to reside with Dollie Owens, Maynard's former mother-in-law.[1] Maynard and her son were not to leave Owens's home together unless Owens accompanied them. Maynard was also ordered to follow the court's orders and to remain clean and sober at all times.

The adjudication hearing was held on July 22, 2010. Freeman Peters, a DHS investigator, testified that he was interviewing Maynard on an unrelated matter when she admitted that she had Xanax and Valium for which she did not have a prescription. Peters administered a drug screen to Maynard, which was positive for methamphetamine and benzoids. As a result of the positive drug screen and pursuant to DHS policy, J.M. was taken into custody for his protection. Peters said that he asked Maynard whether she had a history of illegal drug abuse and received a negative response. He did not recall Maynard saying that she expected to test positive for marijuana. Peters acknowledged that the sole reason for J.M. being taken into custody was Maynard's positive drug test. On cross-examination, Peters said that, based on his experience, parents who are under the influence of drugs are not able to properly care for their children. He also said that J.M. appeared to be well cared for by Maynard. Peters also said that Maynard tested positive for benzoids at a second drug screen on May 26. According to Peters, Maynard said that there was no reason she was testing positive for methamphetamine. He also said that

the fact that Maynard was taking Xanax and Valium without a prescription indicated that she had a problem with addiction and that it would be difficult for her to make reasonable decisions about J.M.'s welfare.

Jeff Gaskin, the DHS worker assigned to the case, testified that the department wanted J.M. to remain in Maynard's temporary custody and for Maynard to remain clean and sober, submit to random drug screens, attend individual counseling, and submit to a psychological evaluation. Gaskin did not believe that inpatient treatment was needed. Although Gaskin wanted to maintain the requirement that Maynard continue to live with Owens, he recommended that she be allowed to leave with J.M. without the necessity of Owens accompanying them. According to Gaskin, all of J.M.'s needs were being met with the current safety plan and he had no concerns about J.M.'s safety or well being. Noting that Maynard's income came from babysitting, Gaskin opined that she would be unable to financially support her family without living with Owens.

Louis "Andy" Pellett, the CASA volunteer, testified that, as long as the current arrangements continued, he did not have any concerns about J.M.'s welfare. He said that Maynard was not earning enough money babysitting to support her family. He also said that Maynard was regularly attending NA meetings. Pellett reported that Maynard told him that she had submitted to a psychological evaluation in the past and that she was bipolar and schizophrenic. According to Pellett, J.M. and Maynard had a positive relationship. He did not have any concerns about DHS's recommendation that Maynard and J.M.

1. The circuit court referred to Owens as J.M.'s grandmother. However, Owens testified that she was Maynard's former mother- in-law and the grandmother to some of Maynard's other children.

be allowed to leave together without Owens accompanying them.

Christina Maynard testified that she had lived with or near Dolly Owens since before she married. She said that she was put on medications such as Klonopin, Norco, and pain medication while she lived in Washington and Oregon in 2006, but that she could not afford her medications. She explained that she tested positive for benzoids because she was taking Xanax, Valium, and pain pills. The Xanax and Valium were not prescribed for her. She also believed that she tested positive for marijuana because she had smoked marijuana a few days before J.M. was removed. Maynard denied using methamphetamine or being around J.M. when she was under the influence of anything. She also said that she was regularly attending NA meetings. She acknowledged that she was unemployed and had made little effort to obtain employment in the past four years. She also lacked transportation. Maynard was attempting to obtain Social Security benefits. Maynard's income derived from babysitting three days per week, for which she was paid $20 per day during the week and $45 per day on the weekends.

Dolly Owens testified that, except for a few months when Maynard moved to Oregon, Maynard had lived with her for several years. Owens described Maynard as a "good mother" and said that she had not seen anything that would cause her concern regarding Maynard's ability to care for J.M. She did not know of any illegal drug use by Maynard. She acknowledged that Maynard was not working enough to support J.M. on her own.

In its written order, entered on July 22, 2010, the court found J.M. to be dependent-neglected.[5] The court found by clear and convincing evidence[2] that J.M. suffered from neglect in that Maynard failed to take reasonable action to protect him from neglect or parental unfitness when the existence of the condition was known or should have been known when she tested positive for methamphetamine and other drugs when J.M. was in her care and custody. The court also found that J.M. suffered from neglect from Maynard's failure to appropriately supervise J.M. that resulted in his being left alone at an inappropriate age or in inappropriate circumstances, creating a dangerous situation or a situation that put J.M. at risk of harm. This appeal followed.

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9–27–327(a)(1) (Repl.2009). Dependency-neglect allegations must be proven by a preponderance of the evidence. Ark.Code Ann. § 9–27–325(h)(2)(B) (Repl.2009). We will not reverse the circuit court's findings unless they are clearly erroneous. *Seago v. Arkansas Dep't of Human Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733. In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Id.* The focus of an adjudication hearing is on the child, not the parent; at this stage of a proceeding, the juvenile code is concerned with whether the child is dependent-neglected. *Id.* An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected. *Id.; Albright v. Arkansas Dep't of Human Servs.*, 97 Ark. App. 277, 248 S.W.3d 498 (2007).

Arkansas Code Annotated section 9–27–303(18)(A) (Repl.2009) defines a "depen-

---

**2.** Although the circuit court made its findings by clear and convincing evidence, only proof by a preponderance of the evidence is neces-

sary in an adjudication hearing. Ark.Code Ann. § 9–27–325(h)(2)(B) (Repl.2009).

dent-neglected juvenile" as any juvenile who is at substantial risk of serious harm as a result of abandonment, abuse, sexual abuse, sexual exploitation, or neglect. The circuit court found that two of the statutory definitions of "neglect" had been proven: (1) that Maynard failed to take reasonable action to protect J.M. from neglect or parental unfitness when the existence of this condition was known or should have been known and (2) that J.M. suffered from neglect due to Maynard's failure to appropriately supervise J.M. that resulted in his being placed in inappropriate circumstances, creating a dangerous situation or a situation that put J.M. at risk of harm. *See* Ark.Code Ann. § 9–27–303(36)(A)(iii), (vii).

■ Maynard argues on appeal that there is no evidence that J.M. was placed at a substantial risk of serious harm because of Maynard's one failed drug test. However, the evidence revealed more than a single failed drug test. There were two tests administered by DHS, both of which were positive. There were other factors indicating that Maynard had a drug problem, including Maynard admitting that she had used marijuana just a few days prior to DHS removing J.M. and that she had been taking Xanax and Valium for some four years without a prescription for either drug. The fact that Maynard had limited, irregular income also placed J.M. at risk and was not in his best interest. *See Carroll v. Arkansas Dep't of Human Servs.*, 85 Ark.App. 255, 148 S.W.3d 780 (2004).

■ |₇The statutory definition of a neglected child does not require proof of actual harm or impairment having been experienced by the child. The term "substantial risk" speaks in terms of future harm. In *Brewer v. Arkansas Department of Human Services*, 71 Ark.App. 364, 43 S.W.3d 196 (2001), we explained:

Parental unfitness is not necessarily predicated upon the parent's causing some direct injury to the child in question. Such a construction of the law would fly in the face of the General Assembly's expressed purpose of protecting dependent-neglected children and making those children's health and safety the juvenile code's paramount concern. To require Logan to suffer the same fate as his older sister before obtaining the protection of the state would be tragic and cruel.

71 Ark.App. at 368, 43 S.W.3d at 199; *see also Arkansas Dep't of Human Servs. v. McDonald*, 80 Ark.App. 104, 91 S.W.3d 536 (2002).

The circuit court took judicial notice that a parent under the influence of drugs cannot make reasonable decisions about their child's health, safety, or welfare. Maynard argues that the court's action in taking judicial notice was improper because this was not a "fact" capable of being judicially noticed and none of the other requirements for taking judicial notice were met. This argument is not preserved for our review because Maynard did not object to the circuit court taking judicial notice. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. Ark. R. Evid. 201(e). In the absence of prior notification, the request may be made after judicial notice has been taken. *Id.* Maynard neither objected nor requested a hearing on the propriety of judicial notice. To preserve an argument for appeal, there must be an objection in the circuit court that is sufficient to apprise that court of the particular error alleged. *Love |₈v. State*, 324 Ark. 526, 922 S.W.2d 701 (1996); Ark. R. Evid. 103(a)(1).

Maynard's drug use affected her ability to care for J.M. in at least two ways.

First, Maynard's drug use exposed her to criminal liability, which inevitably would affect J.M.'s well being because she could not care for J.M. if she were incarcerated. Second, Maynard's ability to care for J.M. may have been impaired while being under the influence of drugs. It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his or her parental responsibilities. *See Bearden v. Arkansas Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397 (2001) (holding that living in a prolonged state of uncertainty about a parent's drug use is not in the child's best interests).

We cannot say that the circuit court's findings are clearly erroneous. Also, we are not left with a firm conviction that a mistake has been made. Therefore, we affirm the circuit court's adjudication order.

Affirmed.

VAUGHT, C.J., and ABRAMSON, J., agree.