

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-15-669

| | |
|---|---|
| SAMANTHA SAMUELS AND SHANDON SAMUELS<br><br>              APPELLANTS<br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br>              APPELLEES | **Opinion Delivered** January 6, 2016<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. J15-3293]<br><br>HONORABLE STACEY ZIMMERMAN, JUDGE<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

Appellants Samantha and Shandon Samuels appeal from the Washington County Circuit Court's order adjudicating their son, A.S. (DOB: 4-8-2015), dependent-neglected. Appellants argue that the trial court erred in finding that there was "a substantial risk of serious harm" to A.S. and that the trial court erred by not performing a complete analysis of whether reasonable efforts were made to prevent or eliminate the need for A.S.'s removal from their custody. We affirm the adjudication.

I. *Procedural History*

On April 16, 2015, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect with respect to A.S. An affidavit authored by Monika Isenhower, a DHS case worker, was attached to the petition indicating that a report was received on April 9, 2015, that Samantha had dropped her newborn baby

SLIP OPINION

at the hospital. According to Samantha, she awoke to a thud and heard A.S. crying. Hospital staff reported that Samantha had been repeatedly warned not to breast-feed the baby while alone. The hospital staff did not learn of the baby's fall until approximately ten minutes after it had happened. Samantha admitted to hospital staff that she had called her husband before notifying them, but she later denied this. A.S. was "jittery and shaky" after the fall but ultimately did not appear to be injured.

Isenhower also attested that Samantha had admitted to nursing staff that her parental rights were terminated as to two of her other children for malnourishment. Nursing staff reported concerns that Samantha was not feeding A.S. properly, that A.S. had difficulty breast-feeding, and that he was not gaining weight. The nursing staff observed Samantha teasing A.S. by placing her nipple in the baby's mouth, taking it out, and laughing. A CHRIS search revealed a true finding in August 2013 for medical neglect and failure to thrive against Samantha with respect to her twin daughters. Her parental rights to these children were terminated in October 2014.

The affidavit also indicated that Samantha had prior diagnoses of schizophrenia, bipolar disorder, ADHD, ADD, PTSD, and "split personality" but that Samantha had stopped taking her medication during her pregnancy. Samantha told nursing staff that she did not need the medication and did not plan to resume taking her medication after she left the hospital because it made her drowsy.

Moreover, Isenhower attested that Samantha had said that she planned to get a job after leaving the hospital and that Shandon would be A.S.'s caregiver. According to



Samantha, Shandon's own child had been removed from his custody, and he was getting help for anger management. There was information that Shandon had violently "acted out" during a visit at the hospital to the point that security had to be called. Isenhower stated that, on one occasion, she had attempted to speak with Shandon over the telephone about a court date, but she stated that Shandon was shouting and cursing so loudly that he was unintelligible and that she was finally forced to hang up on him. There was also information that, while Samantha's daughters were in foster care, Shandon had beaten Samantha so badly that she was hospitalized but that Shandon had subsequently refused DHS's offer of services for domestic-violence counseling and random drug screens.

On April 16, 2015, the trial court entered an ex parte order for emergency custody of A.S. and later found that probable cause existed to issue that order to protect A.S. An adjudication hearing was held on June 9, 2015.

## II.  *Adjudication Hearing*

Bailey Parker, a NICU nurse, testified that Samantha was drowsy following her Caesarean-section (C-section) due to pain medication. Parker testified that she had instructed Shandon and another person who was present in Samantha's room that the mother was not to be left alone with the baby for the first twelve to twenty-four hours following surgery. She told them that if they had to leave the room, they should inform the nurses. Parker testified that the nursing staff was not called to sit with the mother prior to Samantha's dropping the baby.

Breanne Gilchrist, licensed master social worker at Washington Regional Medical

Center, testified that Samantha had been educated to not be alone with A.S. for at least twenty-four hours because of the strong pain medication she had been given following the C-section. Gilchrist recalled that Samantha had tried to give herself credit by claiming that it was she who had told the nursing staff that she did not want to be left alone with A.S. because she was afraid she might fall asleep while holding the baby.

Sabrina Knaust, clinical nurse educator at Washington Regional Labor and Delivery, testified that an investigation led her to conclude that Samantha had not hit her call light immediately after dropping the baby and that she had, instead, first called her husband. Knaust stated that Samantha had waited until her husband walked into the room before hitting the call light to inform the nursing staff of the baby's fall. Knaust testified that Samantha was alone with the baby because her husband had left the room.

Isenhower testified with regard to Samantha's history with DHS, repeating much of the information included in her affidavit. She further testified that her investigation into the current allegations resulted in a true finding of inadequate supervision as to both parents.

Samantha admitted that she had been instructed to not be alone with A.S. but that the nurses had left her alone. She insisted that Shandon had left while the nurses were in the room. Samantha testified that after dropping A.S., as she was getting down from the bed, she pushed the call light and that it was only after she had examined her baby for injuries that she called Shandon. She stated that she had missed three visits with A.S. since he had been in DHS custody, that two of the missed visits had related to transportation issues, and that the other one had been just a misunderstanding about the time. Regarding her medication,



Samantha testified that she had been trying to get an appointment with the Ozark Guidance Center, that she had been told that they were booked, and that she was awaiting a call back.

Shandon testified that he did not leave Samantha alone with the baby because he had told the nurses that he was leaving before going outside with his cousin to smoke a cigarette. According to Shandon, he saw the call light on as he rushed into the room and that, while he was comforting the baby, the nurses entered the room. In explaining why he had visited with A.S. only twice, Shandon said that he had been sick with a stomach virus and that there had been a misunderstanding about the time of a visit. Shandon denied that the police had come to the DHS office during visitation because he and Samantha were arguing with DHS workers and screaming in the lobby.

### III.  *Adjudication & Disposition Order*

The trial court found that DHS's first contact with the family arose during an emergency where immediate action was necessary to protect the health, safety, and welfare of A.S. and where preventive services could not be provided. The trial court found that DHS was deemed to have made reasonable efforts to prevent or eliminate the need to remove A.S. from the parents' custody. The trial court noted that DHS had been involved with the family since 2013 with respect to A.S.'s siblings; that services, including home visits, drug screens, counseling, parenting classes, domestic-violence classes, and housing referrals had not prevented the removal of the siblings due to parental unfitness; and that Samantha's parental rights had been terminated in 2014. The trial court found that A.S. was dependent-neglected and at substantial risk of serious harm due to neglect and parental unfitness. The trial court

concluded that the allegations in DHS's petition were true and correct, specifically, that (1) the parents had not followed the rules of the educating nurse in that the mother was left alone with the baby while breast-feeding; the mother had fallen asleep and dropped the baby; and the mother had failed to immediately contact medical personnel, (2) DHS's investigation into the incident resulted in a true finding against the parents for inadequate supervision;[1] there had also been a true finding in August 2013 against the mother with respect to A.S.'s siblings for medical neglect and failure to thrive, which resulted in termination of Samantha's parental rights, and (3) the mother had not been taking her "mental-health" medication. The trial court noted that since A.S. had been in DHS's custody, DHS had made reasonable efforts to provide services, including foster care, casework services, medical services, visitation, and transportation assistance.

## IV. *Standard of Review*

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9-27-327(a)(1)(A) (Supp. 2015). Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2)(B) (Supp. 2015). In dependency-neglect cases, the standard of review on appeal is de novo, but we do not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Figueroa v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 83. A finding is clearly erroneous when, although there is

---

[1]In the judge's oral ruling from the bench, she found that DHS's allegation of inadequate supervision was true as to Shandon but not as to Samantha because she was under the influence of medication from her C-section.

SLIP OPINION

evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id*. In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Maynard v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 82, 389 S.W.3d 627. The focus of an adjudication hearing is on the child, not the parent; at this stage of a proceeding, the juvenile code is concerned with whether the child is dependent-neglected. *Id*.

## V. *Discussion*

### A. Substantial Risk of Serious Harm

A dependent-neglected juvenile means any juvenile who is at substantial risk of serious harm as a result of acts or omissions to the juvenile, a sibling, or another juvenile, including neglect and parental unfitness. Ark. Code Ann. § 9-27-303(18)(A)(v), (vi) (Supp. 2015). "Neglect" means those acts or omissions of a parent that constitute, among other things, a failure to appropriately supervise the juvenile that results in the juvenile's being left alone in inappropriate circumstances, creating a dangerous situation or a situation that puts the juvenile at risk of harm. Ark. Code Ann. § 9-27-303(36)(A)(vii)(*b*). The statutory definition of a neglected child does not require proof of actual harm or impairment. *Maynard, supra.* The term "substantial risk" speaks in terms of future harm. *Harris v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 508, 470 S.W.3d 316.

Appellants do not challenge the trial court's substantial-risk fact findings; rather, they argue that there was error in the legal conclusion that A.S. was at substantial risk of serious harm. According to appellants, the trial court relied on three findings: (1) Samantha was alone

with A.S. against instructions, (2) DHS had made a true finding in August 2013 related to Samantha's children resulting in termination of her rights, and (3) Samantha had not restarted her "mental-health" medication. Regarding the first finding, they say that there was no risk of harm given that "A.S. rolled to the ground, uninjured," that Samantha was no longer on pain medication two months later at the adjudication hearing, and that it was a one-time incident. On the second finding, appellants claim that the trial court erred in adhering to the "once terminated, always adjudicated" ruling because of a true finding of medical neglect and failure to thrive, followed by termination of parental rights that occurred twenty-two months prior to the adjudication hearing. Appellants argue that without more information about the circumstances of the termination, there was not enough evidence to find that A.S. was at substantial risk of serious harm. With respect to the third finding, appellants argue that DHS produced no evidence regarding the extent of Samantha's illnesses, that there was no information about how bipolar disorder affected Samantha's parenting abilities, and that there was no information as to what danger, if any, she posed to A.S. while not taking her medication.

We do not agree that the trial court reached its conclusion on risk of harm based only on the three findings set forth above. There was testimony that the nursing staff had instructed Shandon that Samantha was not to be left alone while breast-feeding A.S. The trial court was not required to believe appellants' testimony that it was the nurses—not Shandon—who had left Samantha alone with the baby. The trial court specifically found that the nurses who testified were "very credible" in denying that they had left Samantha alone.

Shandon's failure to follow simple instructions resulted in a foreseeable event—A.S.'s being dropped by his mother who was under the influence of pain medication. Appellants do not dispute the trial court's finding that Shandon's inadequate supervision placed A.S. at substantial risk of serious harm. An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected. *Maynard*, *supra*. Only one basis for dependency-neglect is required, and we thus affirm the adjudication on the unchallenged basis that Shandon inadequately supervised the child, placing A.S. at substantial risk of serious harm. *See Merritt v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 503, 471 S.W.3d 231.

### B. Reasonable Efforts

"Reasonable efforts" means efforts to preserve the family before the placement of a child in foster care to prevent the need for removing the child from his home and efforts to reunify a family made after a child is placed out of his home to make it possible for him to safely return home. Ark. Code Ann. § 9-27-303(48)(A)(i). The juvenile division of circuit court may deem that reasonable efforts have been made when the court has found that the first contact by the department occurred during an emergency in which the child could not safely remain at home, even with reasonable services being provided. Ark. Code Ann. § 9-27-303(48)(B).

Appellants argue that, in concluding that DHS made reasonable efforts to prevent removal, the trial court failed to make specific findings as required by Ark. Code Ann. § 9-27-328(b)(2). Appellants contend that the trial court also erred in finding that DHS made

reasonable efforts based on an emergency situation without also finding that A.S. would not be safe "even with reasonable services being provided" pursuant to Ark. Code Ann. § 9-27-328(c). Finally, appellants argue that there was no evidence that DHS had offered any of the enumerated services in 2013 with respect to A.S.'s siblings.

The trial court was not required to make specific findings under section 9-27-328(b)(2) because this was an emergency situation in which, pursuant to section 9-27-328(c), reasonable efforts were not required. Section 9-27-328(c) provides that when the state agency's first contact with the family has occurred during an emergency in which the juvenile could not safely remain at home, even with reasonable services being provided, the responsible state agency shall be deemed to have made reasonable efforts to prevent or eliminate the need for removal. *See also* Ark. Code Ann. § 9-27-303(48)(B). In any event, reasonable efforts to reunite a child with his parents shall not be required if a court of competent jurisdiction, including the juvenile division of circuit court, has determined by clear and convincing evidence that the parent has had her parental rights involuntarily terminated as to a sibling of the child. Ark. Code Ann. § 9-27-303(48)(C)(vi). Here, the trial court noted that Samantha's parental rights to A.S.'s siblings were terminated, thus reasonable efforts were not required, regardless of any emergency situation.

As for appellants' argument that the trial court erred in considering services provided to them in 2013 when there was no evidence that DHS had in fact provided those services, we note that appellants did not raise any objection below. Reference to those services was first made in Isenhower's affidavit attached to the petition for emergency custody. Appellants

10



had an opportunity to object at the subsequent adjudication hearing, and their failure to do so waives any argument on that point. *See, e.g.*, *Ashcroft v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 244, 374 S.W.3d 743 (holding that we will not consider evidentiary arguments raised for the first time on appeal).

## VI.  *Conclusion*

We cannot say that the trial court's adjudication of A.S. as dependent–neglected was clearly erroneous or clearly against the preponderance of the evidence; therefore, we affirm.

Affirmed.

ABRAMSON and WHITEAKER, JJ., agree.

*Brett D. Watson, Attorney at Law*, by: *Brett D. Watson*, for appellant.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by:  *Keith L. Chrestman*, attorney ad litem for minor child.