Cite as 2023 Ark. App. 569

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-23-263

|  |  |
|---|---|
| MARY LINK AND THOMAS LINK<br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILDREN<br>APPELLEES | Opinion Delivered December 6, 2023<br><br>APPEAL FROM THE MILLER<br>COUNTY CIRCUIT COURT<br>[NO. 46JV-22-134]<br><br>HONORABLE L. WREN<br>AUTREY, JUDGE<br><br>AFFIRMED |

**KENNETH S. HIXSON, Judge**

Mary Link and Thomas Link appeal separately from an adjudication order finding their children, MC1 (DOB 08-19-06), MC2 (DOB 11-12-11), and MC3 (DOB 04-30-15) dependent-neglected. In Mary's appeal, she argues that the Arkansas Department of Human Services (DHS) failed to sufficiently prove that the children were dependent-neglected and also that DHS failed to make reasonable efforts to prevent the children's removal. In Thomas's appeal, he too argues that DHS failed to sufficiently prove that the children were dependent-neglected. We affirm.

I. *Facts and Procedural History*

DHS has had a long history of involvement with this family, which dates back to 2014 when a protective-services case was opened for suspected environmental neglect. DHS had

further involvement with the family in 2016, 2018, and 2019. Most recently, DHS opened a protective-services case in May 2022 concerning allegations of educational neglect—specifically that the children had not been attending school for the past two years—and DHS again began providing services to the family.

On October 31, 2022, while this most recent protective-services case remained open, DHS received a hotline report citing allegations of environmental neglect, inadequate shelter, and inadequate supervision. After an investigation that included interviews with all three children, DHS exercised an emergency hold on the children on November 1, 2022.

On November 7, 2022, DHS filed a petition for emergency custody and dependency-neglect. DHS attached to the petition the affidavit of DHS investigator Peter Ferrara. The affidavit stated that in the hotline report it was alleged that the Links' trailer had no running water, a significant cockroach infestation, and a shortage of food for the children. It was also alleged that MC1 was not being taken to medical appointments and that Thomas may be using controlled substances. Mr. Ferrara stated in the affidavit that he went to each of the three children's respective schools and independently interviewed each child. According to the affidavit, MC1 told him that their home was frequently without running water and that the family had been without running water for approximately two weeks. MC1 further stated that their home has cockroaches "everywhere" and that there is frequently a shortage of food, especially in the middle of the month when their food stamps run out. MC1 also stated that her mother was bedridden due to an ankle surgery and that MC1 was frequently forced to be the caretaker for her younger siblings. MC1 stated that she suspected her father

may be using drugs because he associated with a friend who uses drugs and would stay gone from the residence for days at a time. When Mr. Ferrara interviewed MC2, MC2 stated that her father cannot keep up with the bills; that they will go several days without running water, and the water had been off for the last five days; and that there were so many cockroaches in the home that she had seen her father vacuum up the roaches with a shop vac. In MC3's interview, he stated that the children do not have enough to eat or have clean clothes; that there was no running water in the home, and he had not bathed in a while; and that there were "too many [cockroaches] to count."

Mr. Ferrara's affidavit went on to state that after he interviewed the children, he proceeded to the Links' trailer in an attempt to make contact with the parents. He arrived at 11:25 a.m. and received no response after knocking on the door of the residence.[1] No sounds or activity were detected inside the trailer. Mr. Ferrara stated that he saw large amounts of bagged and unbagged trash in the yard, and there was a foul odor emanating from the porch and surrounding area. Based on these facts, DHS exercised an emergency hold on the children.

On November 8, 2022, the trial court entered an ex parte order for emergency custody of the children. On December 14, 2022, the trial court entered a probable-cause order stating that the parents had waived the probable-cause hearing and requested that an adjudication hearing be scheduled.

---

[1] It was later learned that Mary was inside the trailer that day when Mr. Ferrara knocked on the door.

The adjudication hearing was held on January 9, 2023. Mr. Ferrara was the first witness to testify. Mr. Ferrara testified about his interviews with the three children and their statements concerning the trailer sometimes being without running water or adequate food and the roach infestation. Mr. Ferrara also testified about his visit to the trailer wherein he observed trash "piled very high" by the mailbox near the trash receptacle, where some of the bags had "burst and the trash had fallen on the ground and not been picked up." Mr. Ferrara also observed a small amount of trash on the porch and stated there was a "no trespassing" sign on the front door. When Mr. Ferrara knocked on the door, no one answered. Mr. Ferrara also stated that there was an unpleasant odor on the porch. Mr. Ferrara produced photographs that were consistent with his description of the condition of the property. Mr. Ferrara testified that, from what he had observed, the trailer was not a fit and proper or environmentally safe place for the children to be living.

Mr. Ferrara stated that when he exercised the emergency hold on the children, they had a "very strong odor that would be associated with when you don't wash yourself and sweat." He stated that, in addition to their initial clothing allowance, DHS purchased hygiene items, including shampoo and soap, and let the children bathe before they changed into clean clothes.

Alexis Lampkins, who is the primary caseworker in the case, testified next. Ms. Lampkins stated that, as part of the open protective-services case, DHS completed a referral for the Youth Advocate Program (YAP), which she described as a "preventative service" to assist the family. Ms. Lampkins further testified that DHS provided home visits,

4

transportation, and cleaning supplies. Ms. Lampkins, however, stated that both parents were uncooperative with DHS and at times would become upset and decline to accept the cleaning supplies. Ms. Lampkins stated that the parents "were 100 percent against the Department providing services to them" and that DHS had difficulty gaining access to the house. Ms. Lampkins stated further that, despite DHS efforts, the unsanitary and unsafe condition of the home had not been remedied. She indicated that there was a lot of trash, a cockroach issue, and floors in need of repair. Ms. Lampkins stated that this was not just a dirty home but one that was unsafe and dangerous for the children. She described it as a "severe environmental issue in the home" and stated, "I've addressed it, and it has just not been remedied as it should be." Ms. Lampkins also suspected a possible issue with substance abuse, and she testified that she had asked both parents to submit to a random drug screen but that both had refused. Ms. Lampkins believed it was in the children's best interest to remain in DHS custody and continue to receive services.

On cross-examination, Ms. Lampkins was questioned about another caseworker's visit to the trailer, which had occurred on October 30, 2022, just two days before removal of the children. Reading from the other caseworker's report, Ms. Lampkins stated that on that visit, the trash was stacked in the yard as it had been before, and the yard needed to be cleaned. However, the caseworker also reported a clean kitchen and running water and further reported "a few groceries [were] needed" and there were a "few pests."

Melanie Bellew is a family intervention specialist for YAP and stated that, beginning August 11, 2022, she would visit the home twice a week for a minimum of two hours each

visit and provide intensive treatment services and counseling for the family. Ms. Bellew stated that on her first visit, there were lots of bugs and the home was in disarray, but after that, there were significant improvements in the home. She did indicate that there was an issue with trash and roaches and there was an odor in the house, but she never noticed the need for any repairs.

Christina Johnson, a therapist, provides counseling for all three children. Ms. Johnson testified that MC1 had expressed feeling depressed, having anxiety, and having suicidal ideation and further expressed that these issues were related to MC1's relationships in her family. Ms. Johnson was concerned that MC1 has "some trauma that she needs to deal with" and indicated that "from day one" after her removal, MC1 expressed that she did not want to go home to her parents. According to Ms. Johnson, MC1 had been placed in the position of a parental role in caring for her younger siblings, which she thought was an unhealthy environment. Ms. Johnson thought that MC1 needed more therapy before returning to her parents, and she also opined that it would not be in the best interest of MC1's younger siblings to return home at that time.

Mary testified on her own behalf. Mary acknowledged that there had been a roach infestation at the trailer, but she indicated they had since sprayed roach killer and vacuumed up the dead roaches, which helped alleviate the problem. Mary also acknowledged that the floor needs to be repaired and that, on a couple of occasions, they had been without running water but that "it's never been off for not even like seven days." Mary denied that the water was shut off when the children were removed, and she was unsure why her children had

reported it was shut off. Mary stated that the family receives food stamps and that on one occasion the food stamps were cut off due to an issue with her application, and she also acknowledged an issue with having food "like the last of the month maybe." However, Mary stated that the children were never without something to eat and never went to bed hungry. Mary stated that she had broken her ankle and would likely not be able to walk until June 2023. She stated that because of her broken ankle she is not working but that she plans to resume her work at a convenience store when it is healed. Mary stated that there were a few times she refused DHS access to her home but explained that on those occasions, Thomas was not there, and she would have had difficulty getting around with her broken ankle. Mary also acknowledged that, partially due to her broken ankle, she depends on MC1 to help parent the younger children. Mary stated that she missed her children and was working on finding a better home. Mary stated that she would follow any of the trial court's orders because she "would do anything for [her] children."

Thomas testified that he is employed at Family Dollar. He acknowledged that they had run out of food stamps in the past but maintained they had never run out of food. Thomas stated that the water to the trailer had been shut off twice, and he acknowledged that he needed to replace a section of the kitchen floor. He also acknowledged a problem with cockroaches, stating that they are very hard to kill but that "I've pretty much got them eradicated." Thomas stated that on one occasion he refused DHS access to the house but stated that he did so because the caseworker was disrespectful. Thomas also testified that DHS had asked him to take a drug test but that he refused the test, and stated, "I don't see

7

the point in it because I do not have a history of drug abuse." Thomas stated that he had not used methamphetamine since he was eighteen years old.

Based on the evidence presented at the adjudication hearing, on February 6, 2023, the trial court entered an adjudication order finding all three children dependent-neglected due to neglect and parental unfitness. The trial court specifically found that "the allegations in the petition are true and correct and that the parents failed to provide for the essential and necessary physical, mental, and emotional needs of the juveniles including a shelter that does not pose a risk to the health or safety of the juveniles." The trial court found that it was in the best interest of the children to remain in DHS custody, and the goal of the case was reunification with a concurrent goal of relative placement.

Mary and Thomas each separately appealed from the adjudication order.

## II. *Legal Framework*

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9-27-327(a)(1)(A) (Repl. 2020). A dependent-neglected juvenile is one at substantial risk of serious harm as the result of, among other things, neglect or parental unfitness committed against the juvenile, a sibling, or another juvenile. Ark. Code Ann. § 9-27-303(17)(A) (Supp. 2021). Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2)(A)(ii) (Supp. 2021). In dependency-neglect cases, the standard of review on appeal is de novo, but we do not reverse the trial court's findings unless they are clearly erroneous. *Samuels v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 2, 479 S.W.3d 596. A finding is clearly erroneous when,

8

although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In reviewing a dependency-neglect adjudication, we defer to the trial court's evaluation of the credibility of the witnesses. *Id.* The focus of an adjudication hearing is on the child, not the parent; at this stage of a proceeding, the Juvenile Code is concerned with whether the child is dependent-neglected. *Id.*

### III. *Mary's Appeal*

In Mary's appeal, she argues that DHS failed to sufficiently prove that the children were dependent-neglected. Mary also argues that DHS failed to make reasonable efforts to prevent the children's removal. We address Mary's arguments separately.

### A. Adjudication of Dependency-Neglect

Mary first argues that the trial court clearly erred in finding the children dependent-neglected. She contends that there was a lack of evidence to support the trial court's findings of neglect or parental unfitness and further asserts that the children are not at a substantial risk of serious harm.

Mary asserts that, although DHS identified environmental issues with the home during the protective-services case, the testimony at the adjudication hearing showed that these conditions had improved as the case progressed. Mary notes that the YAP family intervention specialist, Melanie Bellew, testified that on her initial visit to the home, it was in disarray but that she later observed "large improvements" and noticed nothing in need of repair. A DHS caseworker visited the home just two days prior to the removal of the children

and noted in her report that the trailer had running water and the kitchen was clean. Although all three children told the DHS investigator that the house was without running water, Mary states that there was no evidence to support these statements and that the children's statements were contradicted by the DHS report. Although there were reports of large amounts of trash around the home, a cockroach problem, and issues with groceries, Mary contends that none of what was reported rises to the level of neglect or parental unfitness. Mary argues that because DHS failed in its burden to prove that the children were dependent-neglected, the adjudication order should be reversed.

Although the trial court's finding that the children were dependent-neglected was based on both neglect and parental unfitness, only one basis is necessary to support a dependency-neglect finding. *See Mayer v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 365, 674 S.W.3d 748. We uphold the trial court's finding of dependency-neglect on the basis of neglect.

"Neglect" includes those acts or omissions of a parent that constitute a failure to provide for the essential and necessary physical, mental, and emotional needs of the juveniles, including failure to provide a shelter that does not pose a risk to the health or safety of the juveniles. Ark. Code Ann. § 9-27-303(37)(A)(iv) (Supp. 2021). Moreover, the statutory definition of a neglected child does not require proof of actual harm or impairment having been experienced by the child. *Maynard v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 82, 389 S.W.3d 627. The term "substantial risk" speaks in terms of future harm. *Id.*

The children were removed from the home after DHS received a hotline report, later confirmed in interviews with the children, that the house had no running water, a roach infestation, and inadequate food. Although Mary denies that the house was without running water at the exact time the children were removed, both Mary and Thomas acknowledged in their testimony that they had been without running water in the past. In MC1's statements to Mr. Ferrara, she stated that the home had roaches "everywhere" and that there was frequently a shortage of food, especially in the middle of the month when their food stamps ran out. When Mr. Ferrara went to the home on the day of removal, he noticed large piles of trash in the yard and foul odor emanating from the porch. Mary was home that day but did not answer when he knocked on the door. Mary and Thomas both testified that there were times when they denied DHS access to the home, and during the case, both Mary and Thomas had also refused a drug test. Thomas also admitted in his testimony that the kitchen floor of the home was in need of repair.

Although Mary argues that improvements were made to the living conditions of the home prior to the children's removal, we find it significant that all three children, when independently interviewed on the day of removal, identified significant environmental concerns in their statements to Mr. Ferrara. The issues of no running water, a cockroach infestation, inadequate food, and an overabundance of trash all bear negatively on the physical, mental, and emotional needs of the children and pose a risk to their health and safety. The primary DHS caseworker testified that this was not just a dirty home but was an unsafe and dangerous situation for the children. Having reviewed the record, we hold that

11

the trial court did not clearly err in finding the children dependent-neglect based on the children being at a substantial risk of serious harm as a result of neglect as defined in the Juvenile Code.

### B. Reasonable DHS Efforts to Prevent Removal

In the adjudication order, the trial court found that DHS had made reasonable efforts to prevent removal of the children. Mary asserts that this finding was clearly erroneous. Mary argues that, other than the YAP services, the only services provided by DHS were home visits and providing cleaning supplies, and she asserts that additional services should have been offered to prevent removal.

Arkansas Code Annotated section 9-27-327(a)(2) (Repl. 2020) provides that at the adjudication hearing,

> [u]nless the court finds that a removal occurred due to an emergency and the agency had no prior contact with the family or the child, evidence shall be presented to the court regarding all prior contact between the agency and the juvenile or the family before a finding of reasonable efforts to prevent removal by the Department of Human Services.

Mary correctly notes that the emergency exception was not applicable because the agency's first contact with the family was not at the time of removal. We, however, conclude that the trial court did not clearly err in finding that reasonable efforts were made to prevent the need for removal of the children. Mary acknowledges that DHS provided cleaning supplies, and in the DHS caseworker's testimony, she stated that the parents would sometimes decline to accept these supplies and were uncooperative with DHS's efforts to provide these and other services. Mary also acknowledges that the family was provided with YAP services,

12

which included a family intervention specialist visiting the home twice a week for a minimum of two hours a day. Despite these services to the parents, the need for removal was not prevented.

Moreover, even if the trial court had not found that reasonable efforts were made, Ark. Code Ann. § 9-27-335(e)(2)(C) (Repl. 2020) would have allowed the trial court to remove the children and transfer custody to DHS "despite the lack of reasonable efforts by the department to prevent the need for out-of-home placement if the transfer is necessary . . . to protect the juveniles health and safety." Here, the trial court specifically found in its order that "continuation of custody in the Department is in the best interests of the juveniles [and] necessary to the protection of the juveniles' health and safety." Because we cannot hold that the findings by the trial court were clearly erroneous, we affirm on this point.

IV. *Thomas's Appeal*

Thomas's only argument on appeal is that the trial court clearly erred in finding the children dependent-neglected. Thomas argues many of the same points raised in Mary's brief and states that there were contradictory facts as to whether the home posed a risk to the children's health and safety, that there was testimony as to improvements to the condition of the home during the protective-services case, and that the children were never without adequate food. The focus of an adjudication hearing is on the child, not the parent; at this stage of a proceeding, the Juvenile Code is concerned with whether the child is dependent-neglected. *Samuels*, *supra*. For the reasons explained in our discussion of Mary's

appeal, we also reject Thomas's argument and hold that the trial court did not clearly err in finding the children dependent-neglected.

Finally, we note that, under Thomas's sole argument on appeal, he also states:

In all actuality, the underlying issue from which these allegations flow is the socio-economic hardship of the Link family. Mary could not work because of her ankle; the family was dependent upon a single-income household and food stamp benefits that fell through in September of 2022.

Thomas goes on to argue that, because of the family's financial hardships, a finding of neglect would not be supported under Ark. Code Ann. § 9-27-303(37)(A)(ii) (Supp. 2021), which provides that "neglect" includes:

Failure or refusal to provide the necessary food, clothing, shelter, or medical treatment necessary for the juvenile's well-being, *except when the failure or refusal is caused primarily by the financial inability of the person legally responsible and no services for relief have been offered*[.]

(Emphasis added.) However, as recognized by Thomas in his brief, the trial court *did not* find neglect under subdivision (37)(A)(ii) of the statute but rather found neglect under subdivision (37)(A)(iv), which provides that neglect includes "[f]ailure . . . to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile." We have already concluded that the trial court's finding of neglect under subdivision (37)(A)(iv) was not clearly erroneous, and as Thomas recognizes, that subsection contains no exception for financial inability. Nonetheless, we note that the record shows that Thomas was employed during the case, the family was living rent-free in a trailer, the family received food stamps, and DHS had been providing cleaning supplies, which were at times rejected by the

14

parents. Thus, we do not agree with Thomas's claim that the family was without means to improve the conditions of the home and provide a safe environment for the children.

V. *Conclusion*

In conclusion, we hold that the trial court committed no clear error in finding the children dependent-neglected, nor do we find clear error in its finding that DHS made reasonable efforts to prevent removal of the children. Therefore, we affirm Mary's appeal, we affirm Thomas's appeal, and the adjudication order is affirmed in its entirety.

Affirmed.

ABRAMSON and WOOD, JJ., agree.

*James & Streit*, by: *Jonathan R. Streit*, for separate appellant Thomas Link.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for separate appellant Mary Link.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.