Cite as 2024 Ark. App. 553

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-24-75

|  |  |
|---|---|
|  | **Opinion Delivered** November 6, 2024 |
| VONCILL COOPER AND RUEY COOPER<br><br>APPELLANTS | APPEAL FROM THE UNION COUNTY CIRCUIT COURT [NO. 70JV-23-72] |
| V. | HONORABLE EDWIN KEATON, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | AFFIRMED |

## KENNETH S. HIXSON, Judge

This is a dependency-neglect case. The two children involved are Minor Child 1 (MC1) and Minor Child 2 (MC2)—both girls—who were ages thirteen and twelve when these dependency-neglect proceedings began. These children were the subject of a previous dependency-neglect case that resulted in the termination of their natural parents' parental rights. The appellants herein, Voncill Cooper (the adoptive mother) and Ruey Cooper (the adoptive father) adopted MC1 and MC2 on December 31, 2022. Appellee Arkansas Department of Human Services (DHS) initiated these dependency-neglect proceedings on September 22, 2023, and on November 17, 2023, the trial court entered an adjudication order finding MC1 and MC2 dependent-neglected as a result of physical and mental abuse.

The Coopers now appeal from the adjudication order, challenging the sufficiency of the evidence to support the adjudication. We affirm.

## I. *Relevant Facts*

On September 22, 2023, DHS filed a petition for dependency-neglect and emergency custody of both children, alleging that the children were dependent-neglected as the result of abuse, neglect, or parental unfitness. The petition stated that the children were removed from the Coopers' custody two days earlier due to an immediate danger to the health or physical well-being of the children.

The affidavit of family-service worker Lisa Givens was attached to DHS's petition. The affidavit stated that both MC1 and MC2 had reported being beaten by Voncill and Ruey with bamboo sticks and purse straps. MC1 stated in an interview that Voncill had hit her with a purse strap on multiple parts of her body, including her head and face, and that she had been suffering from abuse since the first day she was adopted by Voncill and Ruey. MC1 stated that as a result of one of the beatings, she had a bruise on her side that lasted three weeks. MC1 also stated that as punishment, she was made to stay in her room for thirty days and could not come out except to eat and use the bathroom.

The affidavit stated that both children disclosed that they did not feel safe at home and that they were afraid to go home because they were being beaten. Both children also stated that they had plans to commit suicide if they were returned to Voncill and Ruey's residence. Due to concerns about the children's physical and mental health, they were admitted to Riverview Behavioral Health Hospital. During a scheduled family phone

session, MC1 refused to speak to Voncill at all, became very anxious, started breathing heavily, and was on the verge of panic, so the therapist did not force MC1 to talk to Voncill. The family phone session ended after MC1 and MC2 spiraled into anxiety attacks. The affidavit stated that during their treatment, both girls were calm and cooperative, but when the therapist mentioned their adoptive mother, their demeanors changed into a state of panic.

On September 25, 2023, the trial court entered an ex parte order for emergency custody of both children. A probable-cause order followed on October 10, 2023, wherein the trial court found that the children were afraid to return home and that continued DHS custody was necessary for the protection of the children's health and safety.

An adjudication hearing was held on November 6, 2023. MC2 and MC1 were the first witnesses to testify at the hearing.

MC2 testified that since being adopted by the Coopers, she had been subjected to frequent whippings from both Voncill and Ruey. MC2 stated that these whippings were administered with either a purse strap that had a metal piece at the end or a bamboo stick and that they sometimes caused welts or bruising. MC2 stated that Voncill drinks whiskey and that the beatings were worse when she was drinking and were often administered for little or no reason. MC2 also stated that Voncill had told her and her sister that she had researched how to "undo an adoption" and that Voncill and Ruey were planning to undo the adoption.

3

MC2 stated that on one occasion, Ruey beat her with a bamboo stick, causing a bruise on her stomach. MC2 showed the bruise to the school nurse, who MC2 said was shocked by what she saw, and MC2 told the nurse the bruise came from a bad whipping. MC2 stated that on three occasions, she had taken pictures of her bruises or other marks and that when Voncill asked to see her phone, MC2 deleted the pictures for fear of getting into trouble. MC2 also stated that there were occasions when "they would whip me on my arms and legs and stuff," and it would cause welts.

MC2 testified about an incident when she was fighting with MC1, and Voncill told MC2 that she was going to get a whipping. MC2 ran to her bedroom and got under her bed. MC2 stated that Voncill pinched her arm, and MC2 came out from under the bed. After that, Voncill put her foot on MC2's chest, during which MC2 was unable to breathe. MC2 ran into the kitchen. Then, according to MC2, Voncill dragged her by her hair across the floor into the living room. When Voncill dragged her, MC2 was lying down, and MC2's hair was the only thing Voncill was touching. Then Voncill told MC2 to lay across a chair, and she started whipping her. MC2 stated that Voncill had punished her by dragging her in this fashion on two prior occasions, but she never told anyone about it because Voncill threatened the children with further harm if they disclosed the abuse.

MC1 testified that both Voncill and Ruey whipped her using a purse strap or a bamboo stick, and that most of the time, the whippings were for no reason. MC1 stated that the last whipping occurred within a week of the girls being taken into emergency DHS custody. On that most recent occasion, Voncill got mad and told MC1 she was going to

4

hurt her. Voncill made MC1 get up against the kitchen bar and started "rapping [her] across [her] back and neck" with the purse strap. When MC1 turned around, Voncill "actually rapped [her] across [her] face a few times." MC1 described the purse strap as "a black strap with gold metals on it, on both ends."

MC1 described another occasion when "she got whipped everywhere" by Voncill. When asked what she meant by "everywhere," MC1 said, "my face, my neck, my back, my chest, my legs." MC1 stated:

> When she told me to lay across the chair, that's when she whipped me on my butt. And when I kept on getting off the chair because I can't sit there that long getting a whipping, I had moved and I started crawling on the floor and that's when she started rapping me everywhere.

MC1 also described when Voncill made her lie on the treadmill, and MC1 suffered injuries to her face. MC1 testified that Voncill was hitting her with the purse strap nonstop and had hit her at least ten times when MC1 turned over because "it was hurting [her]" and "[she] couldn't stand it." After MC1 turned over, Voncill hit her three time in the face. MC1 stated that these whippings caused bruises, marks, and welts. She stated that "if I got a whipping with that purse strap, I would get a bruise because that rubber would run across my skin." MC1's face was bruised by the purse strap when Voncill "rapped [her] across [her] face [and it] rapped [her] skin off." MC1 corroborated MC2's testimony that the whippings were worse when Voncill was drinking. MC1 stated that she repeatedly reported these whippings to one of her schoolteachers, Shannon Rogers, and showed Ms. Rogers her bruises and marks.

MC1 also testified about how Voncill would send the girls to their bedrooms for weeks at a time as punishment. MC1 stated that on one occasion, she was put in her room for thirty-three days. MC1 stated that she could not come out to eat and that Voncill would "send a plate in there." The only time MC1 could come out of her room was to use the bathroom, after which she "had to go right back in there and had to keep [her] door shut."

Shannon Rogers, one of MC1's schoolteachers, testified next. Ms. Rogers is not only MC1's teacher, she is also a longtime acquaintance of Voncill and is Voncill's neighbor who lives several houses away. Ms. Rogers is also a hairdresser and has styled Voncill's hair.

Ms. Rogers testified that MC1 had come to her repeatedly at school and told her what was going on in their home. MC1 would show Ms. Rogers the marks on her body that she said came from getting whipped by Voncill. Ms. Rogers specifically testified about three times that "really stuck out." The first time, MC1 came to school "with her face looking like it was busted." MC1 had a bandage on her face, but it had been bleeding, so Ms. Rogers applied antibiotic cream and replaced it with a bigger bandage. MC1 told Ms. Rogers that she was getting a whipping, that Voncill kept hitting her in her face, that one time she hit MC1 "real hard," and that it immediately started bleeding. The second time MC1 came in with marks on her arms and legs. The third time MC1 came to Ms. Rogers and showed her scratches on the lower part of her back. Ms. Rogers testified further that one time when she was outside her house, she heard a child who sounded like MC1 screaming and hollering, although she could not "actually hear the physical licks." Ms. Rogers stated that MC1 had spoken with her about wanting to leave Voncill and Ruey's residence. Since Ms. Rogers is a

6

mandated reporter of child abuse, she was asked why she did not report any of this to the proper authorities. She stated that she herself never witnessed any abuse, and "knowing Voncill like I do, I just didn't think she was beating them." Ms. Rogers also stated that she "wanted nothing to do with it" and that she "kept trying to stay out of it."

Ms. Rogers also testified about a conversation she had with Voncill during a time she was styling Voncill's hair. Voncill discussed how she would have MC1 bend over a chair and would whip her with a purse strap. Voncill stated that she had bought the purse for the express purpose of using the strap as a whip. Voncill told Ms. Rogers during their conversation that she would whip the children and tire herself out and that she would have to stop and take a break and then start again. Voncill also talked about how she would make sure to hit the children in the same spot every time to maximize the burn. As a result of overhearing Voncill's comments, one customer became so uncomfortable that she asked to not be scheduled at the same time as Voncill.

DHS family-service worker Lisa Givens was assigned to investigate the case. She stated that she separately interviewed MC1 and MC2 at their school in September 2023 and that both girls stated that they were going to hurt themselves and wanted to commit suicide if they had to go back to Voncill and Ruey's house. Ms. Givens stated that she also spoke with Voncill during the investigation and that Voncill had "really nothing positive to say" about the girls.

DHS family-service worker Jasmine Jennings was assigned to the case, and she supervised the visits between the children and Voncill and Ruey. Ms. Jennings testified that

7

neither child wanted to visit Voncill and Ruey and would ask her why they had to visit. During one visit when MC2 refused to communicate with them, Ruey told her he would "throw the keys and hit her with it if she didn't talk."

Voncill testified that she has had to discipline the children for fighting each other and for not cleaning up after themselves or doing household chores. She admitted that she administered corporal punishment on the children by whipping them with a purse strap but stated that she would hit them only on the buttocks. Voncill stated that she never caused any marks on the children and that she has never abused them. She stated that any marks on MC1's face were caused from fighting with her sister. Voncill also stated that she thought the children's birth mother was coaching them to allege abuse in hope that the children would be placed back with her.

Ruey testified that he, too, used corporal punishment on the children when they were misbehaving or being disrespectful. Ruey stated that these were just "general whippings," that he hit the children only on their buttocks, and that he never saw any marks, scratches, or bruises form the whippings.

Donna Lovett, the children's adoptive aunt, testified that she and her husband live next door to Voncill and Ruey. She testified that when MC1 and MC2 were living with Voncill and Ruey, the children would frequent their house often and that she never saw any marks, scratches, or bruises on the children.

On November 17, 2023, the trial court entered an adjudication order finding the children dependent-neglected as a result of physical and mental abuse. In the adjudication order, the trial court made the following relevant findings:

> The Court finds by a preponderance of the evidence that the allegations in the petition are true and correct and the juveniles are at substantial risk of serious harm as defined in the Arkansas Juvenile Code as a result of: [MC1] and [MC2] were subjected to whippings over a period of time for no good reason. Shannon Rogers testified that Voncill told her that she would hit the children in the same spot to maximize the burning effect and would whip the children until she got tired and would start again after she caught her breath. Voncill bought a purse for the purpose of using it to whip the children. The Court cannot recall hearing about a parent talking about how they whipped their children. . . . All together [the] children said death would be better than returning home. The children were subjected to physical and mental abuse. [MC1] was put in a room for 33 days, only allowed to [use the] bathroom and eat and would have to go right back. Even without marks, whipping for minor offenses is extreme.
>
> . . . .
>
> Ruey did contribute to the dependency neglect of the herein juveniles, specifically, whipped the children and did nothing to stop the mental and physical abuse that the children were subjected to.

The trial court found that the return of the children to Voncill and Ruey's custody is contrary to the welfare of the children and that the continuation of DHS custody is in the children's best interest and necessary for the protection of their health and safety. The goal of the case was reunification with a concurrent plan of a guardianship, and both parents were ordered to complete parenting classes, participate in counseling, and undergo a psychological evaluation.

This appeal followed.

II. *Standard of Review*

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9-27-327(a)(1)(A) (Supp. 2023). A dependent-neglected juvenile is one at substantial risk of serious harm as the result of, among other things, abuse, neglect, or parental unfitness committed against the juvenile, a sibling, or another juvenile. Ark. Code Ann. § 9-27-303(17)(A) (Supp. 2023). Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2) (Supp. 2023). In dependency-neglect cases, the standard of review on appeal is de novo, but we do not reverse the trial court's findings unless they are clearly erroneous. *Walker v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 627, 534 S.W.3d 184. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In reviewing a dependency-neglect adjudication, we defer to the trial court's evaluation of the credibility of the witnesses. *Id.* The focus of an adjudication hearing is on the child, not the parent; at this stage of a proceeding, the juvenile code is concerned with whether the child is dependent-neglected. *Id.* An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication. *Seago v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733. Further, proof of only one allegation is necessary to support a dependency-neglect finding. *See Raynor v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 263, 646 S.W.3d 406.

III. *Analysis*

On appeal from the adjudication order, the Coopers challenge the sufficiency of the evidence to support it. The Coopers contend that the trial court's finding of dependency-neglect was clearly erroneous, and they more specifically argue that the administration of corporal punishment by spanking children and leaving transient marks does not support the adjudication of dependency-neglect. For the following reasons, we disagree with the Coopers' argument.

The trial court adjudicated the children dependent-neglected based on its finding that the children were at substantial risk of serious harm as a result of abuse committed against both children. Pursuant to Ark. Code Ann. § 9-27-303(3)(A), "abuse" includes any of the following acts or omissions by a parent or guardian:

(i) Extreme or repeated cruelty to a juvenile;

....

(iii) Injury to a juvenile's intellectual, emotional, or psychological development as evidenced by observable and substantial impairment of the juvenile's ability to function within the juvenile's normal range of performance and behavior;

....

(v) Any nonaccidental physical injury;

(vi) Any of the following intentional or knowing acts, with physical injury and without justifiable cause:

....

*(d)* Striking a child on the face;

....

11

(vii) Any of the following intentional or knowing acts, with or without physical injury:

....
*(c)* Interfering with a child's breathing;

Pursuant to Ark. Code Ann. § 9-27-303(3)(C)(i)*(a)*, "abuse" shall not include "[p]hysical discipline of a child when it is reasonable and moderate and is inflicted by a parent or guardian for purposes of restraining or correcting the child." Subdivision (3)(C)(ii) provides, "Reasonable and moderate physical discipline inflicted by a parent or guardian shall not include any act that is likely to cause and that does cause injury more serious than transient pain or minor temporary marks." Subdivision (3)(C)(iii) provides, "The age, size, and condition of the child and the location of the injury and the frequency or recurrence of injuries shall be considered when determining whether the physical discipline is reasonable or moderate."

The Coopers argue that although they both admittedly whipped MC1 and MC2, they were attempting to correct the girls' behavior, and these whippings did not rise to the level of abuse as defined in the Arkansas Juvenile Code. The Coopers also contend that there was no evidence that any welts or bruises from using corporal punishment to discipline the children created any substantial risk of serious harm. The Coopers note that the children's aunt and uncle lived next door, and their aunt testified that she never saw any marks or scratches on the children. The Coopers further note that MC1's teacher, Shannon Rogers, is a mandated reporter but did not report any abuse because she did not think Voncill was beating the children.

The Coopers sum up their argument as follows:

> Corporal punishment of children for bad behavior is as old as having children. There may be disagreement about the method, but if there is no substantial harm, the parents have the freedom to decide how to raise their children as a liberty interest. The definition of abuse does not include the use of corporal punishment for disciplining a child so long as the discipline is moderated so it would not cause substantial harm or injury. There is no evidence in this case of any substantial harm or injury. Absent proof that the spankings were anything other than moderate or reasonable and that they resulted in other than transient pain, there is no abuse.

Having reviewed the record, we conclude that the trial court did not clearly err in adjudicating MC1 and MC2 dependent-neglected based on its finding that the children are at substantial risk of serious harm as the result of abuse. MC1 testified that Voncill had whipped her repeatedly with a purse strap with metal ends that causes welts throughout her body and that Voncill struck her three times in her face, which caused immediate bleeding and a bruise. When MC1 came to school with a bandage on her face, Ms. Rogers saw that it was bleeding and applied antibiotic cream and replaced it with a bigger bandage. MC2 testified that on three occasions, Voncill disciplined her by dragging her across the floor by her hair, after which she would administer a whipping. MC2 testified further that during one such episode, Voncill put her foot on MC2's chest, and MC2 was unable to breathe. MC2 also testified that Ruey whipped her with a bamboo stick, which resulted in a bruise on her stomach that "shocked" the school nurse when MC2 showed it to her. There was also testimony that Voncill made MC1 stay in her room for thirty-three days, and MC1 was allowed to come out only to use the bathroom. As a result of the repeated whippings, both MC1 and MC2 stated that they were afraid to go home, and if they had to return home, they would kill themselves.

13

Although the Coopers argue that they did not abuse the children because their physical discipline was reasonable and moderate and inflicted for the purpose of correcting the children, we do not agree. As an initial matter, both MC1 and MC2 testified that often times, the whippings were for little or no reason at all, and therefore, the whippings were not administered for the purpose of "correcting the child" as required by the relevant statutory provision. *See* Ark. Code Ann. § 9-27-303(3)(C)(i)(*a*). Moreover, there was evidence that the physical discipline went beyond "reasonable and moderate." There was testimony that, while Voncill was having her hair styled, she talked about how she whipped her children and how she made sure to hit the child in the same spot every time to maximize the burn. Voncill indicated in that conversation that she would whip the children and tire herself out and that she would have to stop and take a break and then start again. This is consistent with the severity of the whippings as testified to by MC1 and MC2.

In light of the above, there was evidence presented from which the trial court could conclude that the children were abused due to extreme or repeated cruelty, emotional injury, suffering nonaccidental physical injuries, being struck in the face with physical injury and without justifiable cause, and interference with a child's breathing. Having considered this evidence, we hold that the trial court's finding of abuse was not clearly erroneous.

Although the Coopers also argue that their punishment of the children did not create any substantial risk of serious harm, we conclude otherwise. The statutory definition of a neglected child does not require proof of actual harm or impairment having been experienced by the child. *Maynard v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 82, 389

14

S.W.3d 627. The term "substantial risk" speaks in terms of future harm. *Id.* As a result of the frequency and the severity of the whippings administered by Voncill and Ruey, MC1 and MC2 were afraid to go home, and as stated by the trial court in its order, "[the] children said death would be better than returning home." We are not left with a definite and firm conviction that the trial court made a mistake in finding that MC1 and MC2 were at substantial risk of serious harm as the result of the abuse inflicted by Voncill and Ruey.

IV. *Conclusion*

In conclusion, we hold that the trial court's finding that MC1 and MC2 are dependent-neglected was not clearly erroneous. Accordingly, the adjudication order is affirmed.

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

*Sheila F. Campbell, P.A.*, by: *Sheila F. Campbell*, for appellants.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.